**UNITED STATES of America, Appellee,**

v.

**TWELVE THOUSAND, THREE HUNDRED NINETY DOLLARS ($12,390.00),**

**Willie J. Dorsey, Jr., Idell Dorsey, and Laverne Howard, Appellants.**

No. 90–2071.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 9, 1991.

Decided Feb. 10, 1992.

---

James E. Godfrey, St. Louis, Mo., argued (Gregory G. Fenlon, on the brief), for appellant.

Raymond M. Meyer, St. Louis, Mo., argued (Stephen B. Higgins, on brief), for appellee.

Before ARNOLD,* JOHN R. GIBSON, and BEAM, Circuit Judges.

ARNOLD, Circuit Judge.

Claimants appeal from a decision by the District Court [1] awarding $12,390.00, seized from their home during the execution of a search warrant, to the government. After surmounting an initial jurisdictional hurdle, we affirm.

## I.

On October 10, 1986, local law-enforcement officers executed a search warrant at 3625 Aldine in the City of St. Louis. The warrant, based upon information gathered from a confidential informant and police surveillance, targeted drugs, drug paraphernalia, and money. Although no drugs or drug paraphernalia were found, the police seized five guns and $12,390.00 in currency, located at various points in the house.[2] No arrests were made.

On October 15, 1986, Donald Walton, an agent with the Drug Enforcement Agency, learned of the search at 3625 Aldine through a separate confidential informant. This informant told Walton that the search produced approximately $12,000.00, at least some of which was the product of drug sales by an individual named Gary Miller. This informant also corroborated the details of the search as conducted by the police. Pursuant to 21 U.S.C. § 881, and after confirming this information with the St. Louis police, Walton "adopted" the seizure of the currency for the DEA on October 24, 1986, by taking possession of the currency and initiating administrative forfeiture proceedings.

After the administrative forfeiture proceedings had begun, the claimants filed a motion in a state court for the return of the property seized during the search. This motion was heard and granted by the state court on November 12, 1986. The government filed the present forfeiture action on April 15, 1987. Three people who lived in the house, Willie J. Dorsey, Jr., Idell Dorsey, and Laverne Howard, claimed that the money found in the house belonged to them. Determining that there was probable cause to find that the money was connected to drug transactions, however, the District Court ordered the money forfeited to the government. The Court took this action after hearing testimony offered by claimants to try to show the money had nothing to do with drugs and belonged to them. The Court did not believe this testimony. This appeal followed.

## II.

■ As a preliminary matter, the government asserts that we lack jurisdiction to hear this appeal because the *res* which was the subject of the action is no longer within the jurisdiction of the District Court. After receiving the judgment of forfeiture from the District Court, the government immediately placed a portion of the money in its Asset Forfeiture Fund and distributed the remainder to the St. Louis Police Department pursuant to an "Equitable Sharing Agreement." This action, the government claims, divests us of jurisdiction to hear this matter. We disagree.

Traditional forfeiture law makes the *res* the principal focus of the action. The proceeding is said to be *in rem* as opposed to *in personam*. Under this analysis, if parties wish to challenge an adverse ruling through an appeal, they must act within ten days to stay the proceedings, pursuant to Federal Rule of Civil Procedure 62(a), or

---

* The Hon. Richard S. Arnold became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992.

1. The Hon. Edward L. Filippine, Chief Judge, United States District Court for the Eastern District of Missouri.

2. The search was brought to a premature close when Detective Clifford of the St. Louis Police Department, in an effort to search the ceiling for drugs, accidentally stepped on the head of a baby while attempting to climb onto a couch. Although the baby sustained little or no injury, the search was called off.

take other action to preserve the *res*. If no action is taken by the end of this ten-day automatic stay, parties awarded the property are free to dispose of it as they wish. Once the *res* has been distributed, in the absence of fraud, mistake, or other improper action, the court loses its jurisdiction over the *res*. *United States v. One Lear Jet Aircraft, Serial No. 35A–280*, 836 F.2d 1571, 1573 (11th Cir.) (en banc), *cert. denied*, 487 U.S. 1204, 108 S.Ct. 2844, 101 L.Ed.2d 881 (1988).

In recent years, courts have begun to abandon the rigid structures of this traditional analysis. Spurred by Judge Vance's dissent in the *One Lear Jet* case, *supra*, the First, Second, and Fourth Circuits have all retained jurisdiction in cases like the one before us. See *United States v. One Lot of $25,721.00 in Currency*, 938 F.2d 1417 (1st Cir.1991); *United States v. Aiello*, 912 F.2d 4 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 757, 112 L.Ed.2d 777 (1991); *United States v. $95,945.18*, 913 F.2d 1106 (4th Cir.1990).[3] In finding the notions of the past inapplicable to modern-day forfeiture actions, these courts focus on the unfairness of allowing the government to invoke the jurisdiction of the court and then escape appellate review of a judgment in its favor. *Aiello*, 912 F.2d at 7; *$95,945.18*, 913 F.2d at 1109; *One Lot of $25,721.00*, 938 F.2d at 1419–20; *One Lear Jet*, 836 F.2d at 1579 (Vance, J., dissenting).

In deciding to retain jurisdiction in these cases, our sister Circuits have used two separate reasons to abandon the historical treatment of these appeals. The first line of reasoning is that by initiating an action in federal court, the government has subjected itself to the court's *in personam* jurisdiction. *Aiello*, 912 F.2d at 6; *$95,945.18*, 913 F.2d at 1109; *One Lot of $25,721.00*, 938 F.2d at 1419. Under this analysis, despite the government's distribution of the *res*, the Court retains jurisdiction over the parties throughout the case. The alternative approach focuses on the antiquated notions of admiralty law which the government seeks to apply in denying the

appellants their opportunity to appeal. In the context of government-initiated forfeiture actions, "[u]nlike the typical case where the defendant ship stealthily absconds from port and leaves the plaintiff with no *res* from which to collect, here the defendant *res* is in the possession of the United States and thus in no danger of disappearing." *$95,945.18*, 913 F.2d at 1109. Any sense of urgency in maintaining the *res* is not present in these situations. We find both of these theories to be persuasive, especially when the *res* is cash, which, unlike ships, is fungible.

The government's citation to *Bank of New Orleans & Trust Co. v. Marine Credit Corp.*, 583 F.2d 1063 (8th Cir.1978), is inapposite under the present facts. In that case, the Bank initiated a forfeiture action in a district court to satisfy several ship mortgages which it held. After following all the necessary procedures, a default judgment was awarded against the *res*, and the *res* (four vessels) was sold at auction. Marine Credit, the party claiming an interest in the defaulted items, did not enter the action until after the default judgment was awarded to the Bank, and then failed to file a motion to reclaim the *res* until after *res* had been sold. In the present action, the forfeiture of suspected narcotics proceeds was initiated by the government, and the claimants, from whom the money was seized, challenged this action in court. Thus, unlike Marine Credit, the present claimants were involved in the action from its outset. As a result, the government was aware of the appellants' claim before it distributed the money.

Secondly, the money involved in the present action, unlike the ships in *Bank of New Orleans*, is easily accessible to the government. A sizable portion of the money, approximately $3,700.00, was placed in the government's Asset Forfeiture Fund. In *Aiello*, money moved to the Asset Forfeiture Fund was considered still within the jurisdiction of the court. 912 F.2d at 7; see also *United States v. $1,322,242.58*, 938 F.2d 433, 438–39 (3d Cir.1991); *One Lot of*

---

**3.** In addition, the Third Circuit has indicated a willingness to follow along these same lines.

See *United States v. $1,322,242.58*, 938 F.2d 433 (3d Cir.1991).

*$25,721.00,* 938 F.2d at 1419–20. Unlike *Aiello* and *Bank of New Orleans,* the remainder of the *res* was not sold to a bona fide purchaser, but was instead distributed to the St. Louis Police Department pursuant to an Equitable Sharing Agreement with local law enforcement. This agency can hardly be considered an innocent purchaser, as it participated in the initial seizure of the money from 3625 Aldine. Thus, should the occasion arise, the DEA could seek the return of the money from the St. Louis Police Department or, in the alternative, produce the money from its Asset Forfeiture Fund.

Furthermore, even if we agreed with the government that *Bank of New Orleans* applies to the present situation, we would still have jurisdiction over this particular appeal. If the removal of the *res* from the jurisdiction of the court is improper, traditional *in rem* jurisdictional analysis does not apply. *Bank of New Orleans,* 583 F.2d at 1068 n. 6. The government's action in the present case was improper. One day after entry of judgment by the District Court, the United States transferred the money to the Asset Forfeiture Fund. As the government concedes, Brief for Appellee 8 n. 1, this transfer should not have taken place within the ten-day automatic-stay period provided by Fed.R.Civ.P. 62(a). The government says that the claimants could have reversed the transfer within the ten-day period by seeking a stay or filing a supersedeas bond, but we are not persuaded by this argument. In the first place, an impropriety on the part of the government should not be allowed to impose on claimants the burden of action. In the second place, we do not even know that claimants were aware of this accounting transfer. Nothing in the record before us indicates that they were, and the government does not say that they were.

In short, the reasons behind the traditional *in rem* rules of jurisdiction do not apply to the present case, and even if they did, we would still have jurisdiction by reason of the exception for improper action. We therefore reject the government's argument that we are without jurisdiction, and turn to a discussion of the merits.

## III.

Of the appellants' four claims of error on this appeal, only one requires any significant discussion.

The claimants argue that the District Court should have dismissed this action because the Missouri state court had already acquired jurisdiction over the money in question. The police executed a search warrant issued by the Circuit Court for the City of St. Louis, and they then filed a return with that same court listing the currency as having been seized. Thus, claimants say, the state court acquired exclusive jurisdiction. Only one court at a time can have jurisdiction over a particular *res.* The government responds that local authorities voluntarily delivered the money to Agent Walton, and that he then initiated federal forfeiture proceedings before any action had been taken by the state court. Indeed, no state forfeiture proceeding was ever commenced. We find the government's reasoning persuasive.

The fact that the government had taken possession of the money and initiated the requisite paperwork for administrative forfeiture is determinative in this case. In *Conrod v. Missouri State Highway Patrol,* 810 S.W.2d 614 (Mo.Ct.App.1991), a claimant sought the return of money seized by a state highway patrolman and later turned over to the DEA. In ruling against the claimant, the Court of Appeals held that because local authorities allowed the DEA to adopt the seizure and institute forfeiture proceedings, prior to any action in the state court, no Missouri court ever got jurisdiction over the money. *Id.* at 617. Purely as a matter of state law, then, no encroachment on the jurisdiction of the state courts has occurred here. It is true that on November 12, 1986, after the money had been delivered to the DEA, the state court directed the St. Louis Police Department to return the money to the claimants. At this point, however, the particular currency involved was no longer in state custody. The state court (by analogy to our reasoning in part II of this opinion, respect-

ing our own appellate jurisdiction) presumably could have ordered the St. Louis Police Department to pay over to claimants an equivalent sum of money, but it never took such action. Indeed, a motion filed by claimants asking the state court to hold the DEA agent in contempt was denied. It seems, then, that the state court itself does not consider that any affront has occurred. We do not think that claimants should have any greater right to complain. The District Court was correct in denying claimants' motion to dismiss for want of jurisdiction.[4]

## IV.

The appellants' final arguments center on trial rulings by the District Court. They assert that the District Court erred by (1) allowing the government to go outside of its pleadings in establishing probable cause for forfeiture; (2) determining that the government had met its burden to show that there was probable cause to forfeit the items; and (3) admitting evidence resulting from the search at 3625 Aldine. We find these contentions without merit.

■ In the present action, the Court determined that the allegations contained in the complaint were sufficient to allow the forfeiture action to proceed. In addition, the Court allowed the government to introduce evidence of some facts which were not alleged in the initial complaint. In so doing, the judge took pains to ensure that the appellants were not confronted with any unfair or prejudicial information of which they were previously unaware. Such action was within his discretion.

■ The District Court also found that the government met its burden of showing probable cause to forfeit the money involved in this case. A review of the record shows that there is ample evidence to support this position. There was evidence

from at least two confidential informants which identified the residence at 3625 Aldine as a location for drug transactions. Police surveillance of the residence, coupled with prior activity on the block, revealed a high volume of traffic entering and leaving the residence. Evidence such as this is consistent with narcotics activity. In addition, the money seized from the residence was wrapped in rubber bands, which, according to the unimpeached testimony of a narcotics officer, is characteristic of the way drug money is stored. Finally, Special Agent Shirley Armstead of the DEA purchased cocaine from Barbara Dorsey, a daughter of the residents of the house, in front of 3625 Aldine approximately two months after the search.[5] When all these facts are viewed together, it is clear that the government met its initial burden of showing probable cause for forfeiture. The burden then shifted to claimants to show by a preponderance of the evidence that the money belonged to them, and that it was unconnected to drug trafficking. Claimants introduced a good deal of testimony in an attempt to make this showing. We do not stop to detail this evidence. Almost all of it was inherently incredible, and the District Court was well within its rights in not believing it.

■ Finally, claimants argue that evidence resulting from the search at 3625 Aldine is not admissible. The argument is without merit. In the first place, the things themselves, the forfeitable items, would not be inadmissible even if they had been seized in violation of the Fourth Amendment. *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1039–40, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). In the second place, as to other evidence resulting from the search that may have been introduced in this case, the Fourth Amendment exclusionary rule would apply, but the search in question was simply not invalid. A sufficient affida-

4. The appellants' reliance on *United States v. $79,123.49 in U.S. Cash and Currency,* 830 F.2d 94 (7th Cir.1987), is misplaced. In that case, the Seventh Circuit ruled that the District Court did not have jurisdiction to hear the case because a state forfeiture action had already been commenced. The state court had established pri-

mary jurisdiction. In the present case, no state forfeiture action has ever been filed.

5. Evidence gathered after the seizure of forfeitable items may be used to establish probable cause for forfeiture. *United States v. $91,-960.00,* 897 F.2d 1457 (8th Cir.1990).

vit in support of the application for the search warrant was filed, there was probable cause to issue the warrant, and the search was valid. The District Court did not err in admitting evidence resulting from the search at 3625 Aldine.

The judgment of the District Court is affirmed.

BEAM, Circuit Judge, dissenting in part.

For the reasons stated below, I respectfully dissent from the portion of the majority opinion upholding the forfeiture of the currency.

It is unnecessary to restate the facts leading to the confiscation of the $12,390 beyond emphasizing, as the majority correctly states, that the search of the Dorsey's residence failed to yield any drugs or drug paraphernalia. Consequently, no criminal charges were filed or arrest warrants issued, and all of the property seized during the search, with the exception of the currency, was returned.

This case presents the court with an opportunity to examine what has become a pervasive government practice: advancing the policies of criminal prosecution through civil forfeitures.[6] My view is that, regrettably, the majority ignores the inherent conflicts between the current processes used in civil forfeitures and the protections that the Constitution gives to owners of private property.

Private ownership of property holds a special place in our society, see U.S. Const. amend. V., as it does in most democratic societies. In short, the Constitution states that the government may not deprive individuals of private property without due process. I cannot reconcile the ease with which title to property may be forfeited under the statute in this case with the due process guarantee of the Fifth Amendment. Accordingly, I would hold that a statute that permits an owner of noncontraband property to be divested of title on a mere showing of probable cause for the institution of a forfeiture suit does not provide the minimum process due.

Here, the government established probable cause for the institution of the forfeiture suit by presenting testimony concerning observations made on a single day of heavy foot and car traffic at the Dorsey residence; statements by a confidential informant that drugs were being sold at the residence; statements by another confidential informant that on the day the police searched the Dorsey residence there were six kilograms of cocaine there, which the police failed to discover; testimony that the seized money was wrapped in a manner commonly used in drug dealing; and statements by a DEA agent that two months *after the seizure*, the agent purchased cocaine from a member of the Dorsey household. How evidence against one member of the household garnered two months after the seizure is relevant to the propriety

---

**6.** In the fiscal year ending September 30, 1990, the Department of Justice's Assets Forfeiture Fund held a balance of approximately $478 million. See U.S. Dep't of Justice, 1990 *Annual Report of the Department of Justice Asset Forfeiture Program* app. A, at 39. Approximately $375 million represented forfeited cash and $88 million represented receipts from forfeiture sales. In addition, approximately $23.5 million worth of forfeited conveyances and other tangible property was transferred to state and local law enforcement agencies through equitable sharing, and $18.1 million worth of conveyances and personal property was retained for official use. *Id.* at 40. Another $1.4 million in forfeited property was transferred to non-participating federal agencies by the Department of Justice. *Id.* The total value of forfeited cash and property represents a growth in asset forfeitures of over 1500 percent since 1985. *See* U.S. Dep't of Justice, *Federal Forfeiture of the Instruments*

and Proceeds of Crime: The Program in a Nutshell 1 (1990). Over the last six years, the government has confiscated money and goods worth approximately $1.5 billion dollars, with another $1.3 billion the fate of which is still undecided. Dick Thornburgh, *Foreword* to U.S. Dep't of Justice, 1990 *Annual Report of the Department of Justice Asset Forfeiture Program.* This year, the government expects to confiscate $700 million worth of property for forfeiture. Stephen Chapman, *A Weapon in the Drug War and its Innocent Casualties,* Chi.Trib., Apr. 18, 1991, at C27. Most of these assets will be converted to dollars and used by law enforcement entities, the seizing agencies, outside of ordinary government appropriation and budgetary processes. See 28 U.S.C.A. § 524(c)(1) (West Supp. 1991). This leads some observers to question whether we are seeing fair and effective law enforcement or an insatiable appetite for a source for increased agency revenue.

of instituting the forfeiture suit is a bit of a mystery, and heightens my misgivings about the constitutionality of the current forfeiture process. Suffice it to say that most of the government's evidence was inadmissible hearsay and highly circumstantial, and all of it was suspect.

I do not quibble with the proposition that hearsay evidence is useable for the purpose of establishing probable cause for the *seizure* of property and the institution of a forfeiture suit. *See Ted's Motors v. United States*, 217 F.2d 777, 780 (8th Cir.1954); *see also United States v. Ninety One Thousand Nine Hundred Sixty Dollars ($91,960)*, 897 F.2d 1457, 1462 (8th Cir. 1990). But, divestiture of title should only be possible with evidence admissible at a trial. Evidence which qualitatively and quantitatively barely meets the threshold for probable cause should never be sufficient to divest title to noncontraband property. Additionally, evidence used to establish probable cause, if not admissible at trial, should not weigh against the claimant's exculpatory evidence. *See* David B. Smith, *Prosecution and Defense of Forfeiture Cases* § 11.03[5], at 11–19 (1991).

At the forfeiture trial here, claimants testified that the seized currency derived from various legitimate sources, including wages, rent payments, savings, and social security benefits. The district court found that claimants lacked credibility and rendered a judgment of forfeiture. The district court, however, did not require the government to test any of its evidence by any of the usual standards of admissibility. The mere showing of probable cause for the institution of the forfeiture suit proved to be sufficient to divest claimants of *title* to the currency. *See* 19 U.S.C. § 1615 (1988) (placing the burden of proof on the claimant to exculpate seized property); *see also United States v. Walker*, 900 F.2d 1201, 1204 (8th Cir.1990) (stating that an unrebutted showing of probable cause will support a judgment of forfeiture). Because of this, and because we do not require the district court to articulate a basis for finding a forfeiture, beyond stating that it lent no credence to the claimant's evidence, the rankest of hearsay evidence is sufficient to divest a claimant of title to his or her property. The ease with which title to property may be divested is a constitutional infirmity that cries out for closer scrutiny by this court and the imposition of stricter standards of proof when noncontraband property is involved.

Supporters of the current forfeiture regime correctly state that the standards of proof that comport with due process are on a sliding scale, with criminal cases on the high end and civil cases on the low end. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof required before parental rights can be terminated is clear and convincing evidence); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that proof beyond a reasonable doubt is required in the adjudicatory stage of delinquency proceedings). It follows, argue supporters, that forfeiture cases, being civil in nature, and against a res, do not require strict standards. Therefore, placing the burden on the claimant/owner of the property to exculpate it after it has been seized by the government, as is currently done, does not violate due process: mere notice of seizure and the *opportunity* to exculpate the seized property is sufficient due process. But this leads to a grave injustice where an owner can be completely divested of property rights by no more than hearsay evidence otherwise inadmissible at a trial. This case demonstrates that, in the area of civil forfeitures, civil and criminal and res distinctions and dichotomies are inadequate legal fictions that have become overly strained. *See* George C. Pratt & William B. Petersen, *Civil Forfeitures in the Second Circuit*, 65 St. John's L.Rev. 653, 654–55 (1991). The majority admits as much when deciding the question of jurisdiction, and I agree with the result reached there. *Supra* at 3–6. It is true that civil cases comport with due process with a lower standard of proof than criminal cases, but this is merely a truism. To the person who loses a house because, without his knowledge, illegal conduct occurred within its four walls, a car

because a child borrowed it and was caught with drugs, or his life savings because the police simply suspect that it is the proceeds of drug transactions, the difference between a civil and criminal proceeding is illusory; to him, a civil forfeiture is as penal as a criminal sanction. *See United States v. Halper,* 490 U.S. 435, 447–48, 109 S.Ct. 1892, 1901, 104 L.Ed.2d 487 (1989) (stating that the criminal/civil dichotomy is too abstract and unresponsive in certain situations); *see generally* Mary M. Cheh, *Constitutional Limits on Using Civil Remedies To Achieve Criminal Law Objectives: Understanding and Transcending the Criminal–Civil Law Distinction* 42 Hastings L.J. 1325 (1991). "[C]ivil labels and good intentions do not themselves obviate the need for criminal due process...." *In re Winship,* 397 U.S. at 365–66, 90 S.Ct. at 1073. This is particularly true in forfeitures cases, which, unlike civil cases between private parties, are initiated by the government, and to which the government may devote its police power and resources.

When the government, through its established agencies, interferes with the title to one's property, or with his independent enjoyment of it, and its action is called in question as not in accordance with the law of the land, we are to test its validity by those principles of civil liberty and constitutional protection which have become established in our system of laws, and not generally by rules that pertain to forms of procedure merely.

*Chicago, Burlington & Quincy R.R. v. Chicago,* 166 U.S. 226, 240, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897).

Civil forfeitures have a history in this country dating back to its founding and were well rooted in the common law. *See, e.g.,* Act of Mar. 2, 1807, ch. 22, §§ 4, 6, 2 Stat. 426; Act of Mar. 22, 1794, ch. 11, § 1, 1 Stat. 347; Act of Aug. 4, 1790, ch. 35, §§ 13, 22, 27, 28, 67, 1 Stat. 157, 161, 163, 176; Act of July, 31, 1789, ch. 5, §§ 12, 36, 1 Stat. 39, 47; *see also Avery v. Everett,* 110 N.Y. 317, 18 N.E. 148 (1888) (discussing the development of forfeiture statutes

in England). But, long usage alone will not shield the process used in carrying them out from due process attack. *See Pacific Mutual Life Ins. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 1054–55, 113 L.Ed.2d 1 (1991) (Kennedy, J., concurring) (widespread adherence to a historical practice does not foreclose a due process challenge); *Williams v. Illinois,* 399 U.S. 235, 239, 90 S.Ct. 2018, 2021, 26 L.Ed.2d 586 (1970) (stating that "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack"); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) (stating that "[t]he fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection to all property in its modern form"). This is especially true where the process is one that has been exported outside of its traditional domain, as have been civil forfeitures, known originally only in customs and revenue actions. *See, e.g.,* Act of Aug. 4, 1790, ch. 35, §§ 13, 22, 27, 28, 67, 1 Stat. 157, 161, 163, 176; Act of July 31, 1789, ch. 5, §§ 12, 36, 1 Stat. 39, 47. " 'Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances.' " *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Id.* (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

Congress has seen fit to expand the role of civil forfeitures in its fight against crime. *See, e.g.,* 16 U.S.C. §§ 65, 117d, 128, 171 (1988) (guns or other property used unlawfully in national parks); 18 U.S.C. § 1082 (1988) (property used in connection with illegal gambling); 18 U.S.C. § 1963(a) (1988) (property used in RICO violation); 18 U.S.C. § 3666 (1988) (property used in

connection with illegal bribes); 18 U.S.C. § 3667 (1988) (property used in connection with liquor violations); 19 U.S.C. § 1453 (1988) (property smuggled in violation of customs laws); 21 U.S.C. § 881 (1988) (property used in drug offenses); 49 U.S.C. § 782 (1988) (vessels used to transport or convey contraband). Although this expansion is completely within Congress' prerogative, the standards of proof used to deprive individuals of their interests in property must fall within constitutional limitations. *See Santosky*, 455 U.S. at 757, 102 S.Ct. at 1396–97 (standards of proof must comport with procedural due process); Laurence H. Tribe, *American Constitutional Law* § 10–15, at 740–41 (2d ed. 1988). In *Santosky*, the Supreme Court declared unconstitutional a New York statute that allowed the state to deprive parents of their parental rights in their child upon finding by a fair preponderance of the evidence that the child was permanently neglected. *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391. In reaching its conclusion, the Court reasoned that a fundamental liberty interest was involved and held that the standard of proof imposed on the state did not provide the parents with adequate due process under the Fourteenth Amendment. *Id.* at 768, 102 S.Ct. at 1402. To reach its holding, the Court balanced three distinct factors first set forth in *Mathews:* 1) the private interest affected by the governmental action; 2) the risk of an erroneous deprivation, and the probable value, if any, of additional or substitute procedural safeguards; and 3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 902; *see also Pacific Mutual Life Insur. Co.*, 111 S.Ct. at 1062 (O'Connor, J., dissenting) (using the *Mathews* test to examine a due process challenge to the constitutionality of punitive damages). Similarly, I apply the same test here.

Under the forfeiture statute used in this case, there are essentially two burdens of proof. *See* 19 U.S.C. § 1615 (1988). The first burden, placed on the government, requires it to show the existence of probable cause for the institution of the forfeiture suit. Once the government has accomplished this, the claimant must exculpate the property subject to forfeiture by a preponderance of the evidence. *See id.* Because the claimant carries a comparatively high burden, the government may divest claimant of title with a mere probable cause showing, often established through the use of inadmissible evidence. Using the *Mathews* test, I find this to be a denial of due process.

First, the interest at stake, private property, is one that has always had enormous importance in our society. From its inception, the Constitution recognized the importance of private property as a concomitant to liberty. The Fifth Amendment embodies the Lockean belief that liberty and the right to possess property are an interwoven whole; neither life, liberty, nor property can be arbitrarily or capriciously denied us by government. *See Lynch v. Household Finance Corp.*, 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424 (1972) (stating that "a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other"); John Locke, *The Second Treatise on Civil Government* ¶ 123–42; *see also* Leonard W. Levy, *Original Intent and the Framers' Constitution* 276–77 (1988). "Indeed, in a free government almost all other rights would become worthless if the government possessed an uncontrollable power over the private fortune of every citizen." *Chicago, Burlington & Quincy R.R.*, 166 U.S. at 236, 17 S.Ct. at 584; *see also* Charles A. Reich, *The New Property*, 73 Yale L.J. 733, 771–74 (1964) (recognizing that an individual's freedom and security depend on his ability to protect property from irrational or procedurally unfair government interference). To deprive an individual of property is to deprive him of a measure of his autonomy and limits his ability to interact with and in society. As

Justice Kennedy has stated, "any system that wishes to protect freedom has to protect property." 6 *Newsletter of the Comm'n on the Bicentennial of the U.S. Constitution No. 3*, at 1 (1990). The rush of the Eastern Europeans to privatize their industries and to allow the citizens of their respective countries to acquire and create private property demonstrates the validity and vitality of Justice Kennedy's words. The world over is realizing that private property is an indispensable thread in the fabric of a democratic and free society and that the protection of private property is an important check on governmental power.

Additionally, although civil forfeitures are punitive in nature and have all the stigma associated with punitive proceedings, many of the constitutional protections found in such proceedings are notably absent. The lack of these protections creates a situation where government deprivation of property is too easily accomplished. This situation demands that more process be incorporated into forfeiture proceedings involving noncontraband property. *See, e.g., Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 702, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965) (holding that the exclusionary rule applies to forfeiture proceedings); *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 167, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963) (holding that forfeiture of citizenship is penal in nature and requires all the incidents of a criminal trial).

Second, the current allocation of burdens and standards of proof requires that the claimant prove a negative, that the property was not used in or to facilitate illegal activity, while the government must prove almost nothing. This creates a great risk of an erroneous, irreversible deprivation. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type

of adjudication.' " *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship,* 397 U.S. at 370, 90 S.Ct. at 1076 (Harlan, J., concurring)). The allocation of burdens and standards of proof implicates similar concerns and is of greater importance since it decides who must go forward with evidence and who bears the risk of loss should proof not rise to the standard set. In civil forfeiture cases, where claimants are required to go forward with evidence and exculpate their property by a preponderance of the evidence, all risks are squarely on the claimant. The government, under the current approach, need not produce any admissible evidence and may deprive citizens of property based on the rankest of hearsay and the flimsiest evidence. This result clearly does not reflect the value of private property in our society, and makes the risk of an erroneous deprivation intolerable.

Finally, the third *Mathews* prong asks us to look at the added administrative and fiscal burden on the government of the process proposed. I recognize the importance of civil forfeitures in the government's anticrime arsenal. However, I also recognize the importance of protecting property from erroneous deprivations by the government. Balancing the two, I find that protecting the private property interest of individuals far outweighs any added burden on the government. This is especially true here, where the government may still *seize and hold* the property and *institute a forfeiture suit* with nothing more than probable cause.

To cure the constitutional infirmity in the current allocation of the burdens and standards of proof, the government could be required to inculpate the seized property by a preponderance of the evidence. However, this would require declaring the burden of proof statute used here unconstitutional as applied to this case. *See* 19 U.S.C. § 1615 (1988). A method that would avoid abrogating the statute and, I believe, pass constitutional muster is the method used in Title VII suits. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S.

248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Using the Title VII method, the claimant, after the government's probable cause showing, would establish a rebuttable presumption of right to the property by establishing a colorable claim of title and a colorable claim that the property was acquired legitimately. In this case, the evidence produced by the Dorseys would have established this presumption. The burden would then shift to the government to rebut this presumption with evidence admissible at a trial. The government may do this by either showing claimant has no title or legitimate claim to the property or by showing that the property was derived in violation of the forfeiture statute. The government need not establish these facts by a preponderance of the evidence, but the facts adduced would have to meet the requirements of the federal rules of evidence. Once the presumption falls, the claimant would have to exculpate the property by a preponderance of the evidence to avoid its forfeiture. The burden of proof would always remain with the claimant as required by 19 U.S.C. § 1615.

Adopting either of the methods prevents a forfeiture of noncontraband property when the government's evidence qualitatively and quantitatively does not rise above the probable cause standard. I believe that this strikes the proper balance between the government's law enforcement needs and the rights of individuals in private property.

For the reasons stated above, I would reverse and remand this case to the district court for proceedings consistent with this dissent.