**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**$191,910.00 IN U.S. CURRENCY,
Defendant.**

**Bruce R. Morgan, Claimant–Appellee.**

No. 92–15583.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1993.

Decided Feb. 18, 1994.

Sean Connelly, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellant.

David M. Michael, Mill Valley, California, for the claimant-appellee.

Before: REINHARDT and LEAVY, Circuit Judges, and MERHIGE,* District Judge.

REINHARDT, Circuit Judge:

This case involves the federal government's increasingly widespread use of civil forfeitures to achieve the goals of criminal law enforcement in what used to be called the "war on drugs."[1] The government sought to forfeit $191,910.00 seized from claimant-appellee Bruce R. Morgan. The district court granted Morgan's motion for summary judgment on the ground that the government failed to establish probable cause for the institution of forfeiture proceedings, and the government appealed. We affirm.

## I.

Morgan's encounter with the law began on March 14, 1990, in the San Diego airport. As Morgan passed through Flight Terminal Security (FTS), the FTS officer operating the X-ray machine observed what appeared to be stacks of currency in his bags. The FTS supervisor asked Morgan if she could look inside his bags. Morgan consented, and the supervisor then removed several envelopes from the bags, and ran them through the X-ray machine again. When she asked Morgan what was in the envelopes, he claimed that they only contained pamphlets or brochures. However, her electronic search revealed that the envelopes contained currency.[2]

The FTS personnel allowed Morgan to proceed to the gate with his bags. They then contacted the San Diego Harbor Police, who sent three officers to the gate to investigate. The first to arrive, Officer Jaime Lugo, questioned Morgan for 10 to 15 minutes without placing him under arrest. Morgan told the officer that he was a gemologist and was going to San Francisco to purchase some jade. He stated that he was carrying approximately $20,000 in cash; he said that it was not uncommon for people in the gem

---

* Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. See Paul Feldman & Leslie Berger, *Drug Czar Sells New Strategy to L.A. Audiences*, Los Angeles Times, Oct. 24, 1993, p. A1 (quoting White House drug czar Lee P. Brown as stating that "The Clinton approach 'rejects the use of war analogies to discuss our nation's drug abuse policy.'").

2. The deposition testimony of the two FTS officers is astonishingly inconsistent regarding what the X-ray scan of the envelopes revealed. Gregory Koon, the FTS officer who was operating the machine, "couldn't make out what was on the screen" and saw only "a gray haze of paper." Koon Deposition at 26. Edith Florentino, the FTS supervisor, testified that she could see the currency in some detail, including the pictures of Washington's and Lincoln's heads on the face of the currency. Florentino Deposition at 19.

business to carry large amounts of cash. Officer Lugo allowed Morgan to board his flight to Oakland.

After telling Morgan he was free to leave, Officer Lugo contacted the San Diego Airport Narcotics Task Force. An officer assigned to the San Diego Task Force, John Fung, proceeded to the airport with a drug-sniffing dog. Agent Fung arrived after Morgan's plane had departed, but he called ahead to the San Francisco International Airport Drug Task Force to inform them that Morgan was suspected of carrying a large amount of U.S. currency and was en route to Oakland.[3] Agent Fung spoke with Brad Buckwalter, a Deputy Sheriff assigned to the task force, and gave him Morgan's flight number, physical description, and a description of his clothing and luggage.

Agent Buckwalter received the phone call from Agent Fung at 11:30 A.M. At the time he received the call, he and Arnold Ginn were the only two agents present in the Task Force office at the San Francisco Airport. Agent Buckwalter instructed Agent Ginn to contact David Robinson and Kevin O'Malley—two other agents assigned to the San Francisco Airport, who both wore beepers—and tell them to meet Buckwalter and Ginn at the Oakland Airport. Robinson indicated that he would come to Oakland, but O'Malley did not. He was busy practicing with the Task Force's drug-sniffing dog in a San Mateo park.[4]

Agents Buckwalter and Ginn left their San Francisco Airport office at approximately 11:45 in separate cars. They and Agent Robinson got to the airport in time to meet Morgan's flight, which arrived sometime between 12:45 and 1 P.M. The three agents identified Morgan when he got off the plane and followed him as he claimed his baggage and left the terminal. As Morgan headed for a car rental lot across the street, Agents Buckwalter and Ginn approached him, while Agent Robinson remained in the background. Agent Buckwalter showed his credentials, identified himself as a police officer, and asked if Morgan would answer a few questions. Morgan indicated that he would. In response to their questions, Morgan told the agents that he was a gemologist and had an appointment with a gem dealer in Pleasant Hill to purchase gems for some clients in San Diego. He declined to name the clients or the gem dealer, however. Morgan told the agents that he was carrying about $15,000 for his business. The agents asked him if they could take a quick look in his bags, and he consented.

Morgan was carrying three bags: a suitcase, a flat portfolio case, and a hard-sided case apparently resembling a salesperson's sample case. The agents opened the suitcase, but determined that it only contained pieces of clothing. When they opened the portfolio case, they found two sealed manila envelopes. Morgan stated that these envelopes contained brochures. Finally, the agents opened the hard-sided case. The agents asked Morgan what was in the case, and he told them that it contained his money. He lifted up a sealed manila envelope which was stamped and addressed to an attorney and told them that the envelope contained the $15,000. Morgan then said the true amount of the money might be $20,000. Agent Buckwalter asked Morgan whether the money belonged to him. Morgan initially said that the money belonged to his client from San Diego, but then said that actually some of the money belonged to him and some belonged to the client, although he did not say how much belonged to each person. When asked why the money was sealed in an envelope addressed to an attorney, Morgan replied that he intended to send his attorney whatever money he did not spend in his

---

**3.** The San Francisco Airport Task Force apparently has jurisdiction over the Oakland and San Jose airports as well, although no permanent Task Force agents are assigned to either of these airports.

**4.** The record is unclear regarding whether Agent Ginn actually contacted Agent O'Malley before leaving for the airport. In his deposition, Agent Ginn testified that he thought he had reached Agent O'Malley but that Agent O'Malley was busy doing some type of training. *See* Ginn Deposition at 11–12. Agent O'Malley, however, testified that he had his beeper on during the entire training session and that Agent Ginn first contacted him after the bags were detained, after the training session had ended. *See* O'Malley Deposition at 23–25.

meeting in Pleasant Hill. In response to Agent Buckwalter's questioning, Morgan stated that he had gotten his portion of the money from savings, although he was not sure when he had withdrawn it.[5]

Agent Buckwalter asked to open the manila envelopes in the portfolio case, but Morgan withdrew his consent to the search. Believing he had reasonable suspicion to detain the bags, Agent Buckwalter told Morgan that he was going to hold the bags for further investigation, including a sniff by a drug-sniffing dog. At approximately 1:15 P.M., Agent Buckwalter seized the three bags. He gave Morgan a receipt for them and listed two phone numbers Morgan could call to determine their status. Agent Buckwalter told Morgan that he was free to leave or accompany the bags, and Morgan chose to leave.

After Morgan left, Agent Ginn contacted Agent O'Malley to arrange for the dog sniff. Agent O'Malley, who had completed his training session with the dog, was in San Mateo, across the bay from Oakland. The agents agreed to meet at the Task Force office in Belmont, which is also in San Mateo County. They chose this location because the dog was located closer to the Belmont office than to the Oakland or San Francisco Airports.

Agents Buckwalter and Ginn then drove to Belmont from the Oakland Airport, although they stopped briefly at the San Francisco Airport to allow Agent Ginn to drop off his car. All of the agents arrived at approximately the same time, and, at about 3:20 P.M., the dog sniff occurred.[6] After the dog "alerted" to Morgan's carry-on bags, the agents sought and received a warrant to search the bags. They searched the bags later that day and found six envelopes containing a total of $191,910.00.

On May 1, 1990, the government filed a complaint seeking forfeiture of the $191,910.00, claiming that the money represented the proceeds of narcotics transactions. *See* 21 U.S.C. § 881(a)(6).[7] Morgan filed a verified claim for the money on May 18, 1990. Following discovery, the district court on August 5, 1991 denied the government's motion to dismiss for lack of standing. *United States v. $191,910 in U.S. Currency,* 772 F.Supp. 473, 474–75 (N.D.Cal.1991). The court also denied Morgan's motion to suppress all evidence resulting from the San Diego airport search as fruits of an over-broad administrative search, *id.* at 475–76, as well as his motion to suppress on the ground that the questioning outside the Oakland Airport constituted an illegal arrest. *Id.* at 476–77. The court, however, granted Morgan's motion to suppress all fruits of the luggage detention, holding that its length was excessive and that the agents failed to act with diligence to obtain a quick dog sniff. *Id.* at 478–80.

Claiming that the government had failed to show probable cause for the institution of

---

**5.** Agent Buckwalter testified as follows regarding Morgan's answers:

> He gave me the answer, I think I spelled out the answer in the report. I don't recall specific. I don't want to quote it because I might misquote myself or misquote him.
> He started by saying, I got it the other day. Well, maybe it was a couple of days ago. Well, I'm not real sure when I got it out.
> Buckwalter Deposition at 58.

**6.** Agent Buckwalter's report, the search warrant affidavit, a statement of Agent O'Malley attached to the search warrant application, and Agent O'Malley's deposition all state that the sniff occurred at 3:20 P.M. About a month after his testimony, O'Malley sought to "correct" his deposition by stating that the dog sniff actually occurred at 2:15 P.M. The district court found this "correction" not to be credible, *see United States v. $191,910 in U.S. Currency,* 772 F.Supp.

473, 479 (N.D.Cal.1991), and the government does not challenge on review the district court's finding that the sniff occurred at 3:20 P.M.

**7.** That statute provides:

> (a) Property subject
> The following shall be subject to forfeiture to the United States, and no property right shall exist in them:

> . . . . .

> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used in violation of this subchapter [subject to an innocent owner defense].

forfeiture proceedings, Morgan then moved for summary judgment.[8] On February 7, 1992, the district court granted Morgan's motion. The government's timely appeal followed. On appeal, the government argues that the district court erred by (1) denying the government's motion to dismiss for lack of standing; (2) suppressing the results of the dog sniff test; (3) suppressing evidence of the large amount of money seized; and (4) failing to consider, in determining whether probable cause existed, evidence the government acquired after it instituted this action. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355. We have jurisdiction pursuant to 28 U.S.C. § 1291.[9]

## II.

To have standing to challenge a forfeiture, a claimant must allege that he has an ownership or other interest in the forfeited property. *United States v. $122,043.00 in United States Currency*, 792 F.2d 1470, 1473 (9th Cir.1986). The government argues that Morgan did not have standing, and that the district court therefore erred in denying its motion to dismiss. We agree with the district court that Morgan claimed a sufficient interest to challenge the forfeiture.[10]

In order to contest a forfeiture, a claimant need only have some type of property interest in the forfeited items. This interest need not be an ownership interest; it can be any type of interest, including a possessory interest. *See $122,043.00, supra*, 792 F.2d at 1473; *United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir. 1984) ("It is not necessary therefore that a claimant under the forfeiture statute allege ownership. A lesser property interest such as possession creates standing.") (citing

*United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). Morgan has clearly claimed at least a possessory interest in the money at issue here. The government seized the money from his possession, and he had earlier claimed both possessory and ownership interests in it. When questioned at the airport, Morgan claimed that some of the money belonged to him and that the rest belonged to a client in San Diego. We found that a claimant had standing on very similar facts in *$122,043.00, supra*, where a woman claimed that she was carrying the money for her husband.

The government relies on Morgan's failure to explain his possessory interest in detail in his verified claim, as well as his invocation of the Fifth Amendment when asked to identify the owner of the cash, in asserting that Morgan has merely a "naked and unexplained possessory interest[ ]" insufficient to support standing. But the cases cited by the government do not justify a finding that Morgan did not have standing. These cases simply state that a claimant will not have standing without at some time asserting an interest in the property and describing whether the interest is a possessory interest, an ownership interest, or something else. A claimant need not explain this interest in detail, however, so long as he does something more than conclusorily state that he has some undefined "interest." For example, in *Mercado v. U.S. Customs Service*, 873 F.2d 641 (2d Cir.1989), the claimant had asserted that he did not know there was money in his baggage, had refused to accept a receipt for the money from the government, and had told the police that he did not care what they did with the money. *Id.* at 645. When he later filed a claim for the money without giving any ex-

---

8. 19 U.S.C. § 1615, which applies in this action pursuant to 21 U.S.C. § 881(d), states that the claimant must bear the burden of proof in a forfeiture action, *"Provided*, That probable cause shall first be shown for the institution of such suit or action...."

9. Morgan argues that we lack jurisdiction to review the district court's rulings on the suppression motions, because the government did not take an interlocutory appeal from these rulings. However, it is well settled that, in reviewing a final order in a civil case, we have jurisdiction to

review interlocutory rulings that may have affected the outcome below. *See U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1103 (9th Cir.1985). Indeed, we have reviewed the merits of suppression motions in cases similar to this one. *See United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 (9th Cir.1988).

10. The district court's determination that Morgan had standing is a question of law which we review de novo. *See Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir.1993).

planation of what his interest was, the court not surprisingly found that he did not have standing and stated that "[t]here must be some indication that the claimant is in fact a possessor, not a simple, perhaps unknowing custodian." *Id.* The court suggested, however, that a claimant's assertion that he was carrying the money for his sibling or spouse would be sufficient indication that the claimant was a possessor.[11]

Several principles emerge from these cases. As an initial matter, a simple claim of *ownership* will be sufficient to create standing to challenge a forfeiture. Mere *unexplained possession* will not be sufficient. However, where a claimant asserts a *possessory interest* and provides some explanation of it (e.g., that he is holding the item for a friend), he will have standing.[12] Here, Morgan clearly described the interest he asserted in the money—he claimed that he owned some of the money and that he was carrying the rest for a client. He did not disclaim knowledge of the money he was carrying,

and he did ask for a receipt from the police. His was certainly more than the kind of naked, unexplained claim of possessory interest held insufficient in *Mercado*. It was a repeated, colorable claim of possessory *and* ownership interests which, combined with the fact that the money was taken from Morgan's possession, was more than sufficient to support standing.[13]

**III.**

The government argues that, even if Morgan had standing, the district court erroneously granted his motion for summary judgment. In particular, the government challenges the district court's decision to suppress three pieces of evidence: (1) evidence that a drug-sniffing dog "alerted" to Morgan's luggage; (2) the amount of cash inside the luggage; and (3) the declaration of agent Buckwalter. We believe that the district court correctly excluded these pieces of evidence.[14] We address the dog sniff first.[15]

11. *United States v. $321,470.00, United States Currency,* 874 F.2d 298, 303–04 (5th Cir.1989) (stating that "[u]nexplained naked possession" does not create standing) is to similar effect.

12. Because Morgan asserts merely *his own* ownership and possessory interests in the money and not as a bailee asserting the ownership interests of a bailor, we need not consider the rules which apply where a claimant raises only the interests of another. *Cf. United States v. $260,242.00 U.S. Currency,* 919 F.2d 686, 688 (11th Cir.1990) (per curiam) (stating that, for a bailee to have standing to raise a claim on behalf of a bailor, the bailee must do more than "simply to state that he is a bailee; he must state that he is 'duly authorized to make the claim'" and identify the owner of the property).

13. Although Morgan asserted his Fifth Amendment privilege at his deposition, he clearly asserted an ownership and a possessory interest at the airport. Thus, this case is not like *Baker v. United States,* 722 F.2d 517, 518–19 (9th Cir. 1983). There, the court found no standing where a claimant refused to claim *any* particular interest in the property and instead asserted that the Fifth Amendment allowed him to make a claim for the property without explaining what kind of interest he claimed to have.

Similarly, in *United States v. $15,500.00 United States Currency,* 558 F.2d 1359, 1360–61 (9th Cir.1977), the court refused to find standing where a person who had signatory authority over a safe deposit box challenged the seizure of money from that box. In that case, the claimant

apparently did not ever claim any interest in the money itself, but simply asserted that her interest in the box entitled her to contest the seizure.

In any event, both of these cases seem to require that the claimant assert an *ownership* interest, a requirement that is inconsistent with the Supreme Court's subsequent decision in *Jacobsen, supra.* *See 1982 Sanger, supra,* 738 F.2d at 1046.

14. Motions to suppress are reviewed de novo. *See United States v. Thomas,* 863 F.2d 622, 625 (9th Cir.1988).

15. Because we may affirm the district court's grant of summary judgment on any ground which appears in the record, we have considered Morgan's argument, made in the district court, that nearly all of the evidence adduced in this case should have been suppressed as the fruit of an unconstitutionally overbroad administrative search by Flight Terminal Security (FTS) at the San Diego Airport. We have consistently held that, because of the pervasive governmental role in the airport search program, any search pursuant to that program is considered to be governmental action subject to the Fourth Amendment. *See United States v. Vigil,* 989 F.2d 337, 340 (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 205, 126 L.Ed.2d 162 (1993); *United States v. Davis,* 482 F.2d 893, 904 (9th Cir.1973). As we have noted, *see United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1243–47 (9th Cir.1989), airport security searches can only remain constitutional if they are strictly limited to their compel-

■ Before submitting Morgan's bags to a dog sniff test, the government agents detained them without a warrant for two hours. The district court held that the excessive duration of this detention violated the Fourth Amendment standards set out in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Thus, there was an unlawful seizure of the bags. Although the court held that the length of the detention alone was sufficient to render the seizure of the bags invalid "regardless of diligence," 772 F.Supp. at 480, the court also concluded that the government agents exhibited "a distinct lack of diligence" in failing to take reasonable measures to have a drug-sniffing dog available. *Id.* The court suppressed the evidence of the dog's reaction and of the amount of money in the bags as fruits of the unlawful detention. On appeal, the government challenges the district court's conclusion that the detention violated the Fourth Amendment. We agree with the district court that the detention of the luggage violated the Fourth Amendment, and we therefore affirm the district court's order suppressing the dog-sniff results and the evidence discovered during the subsequent search.

In *Place, supra,* the Supreme Court set forth standards for assessing the constitutionality of detentions of luggage without probable cause. Applying the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to the context of luggage detention, the Court held that a police officer may briefly detain luggage for investigation if he has a reasonable, articulable suspicion that the luggage contains narcotics. *Place,*

462 U.S. at 706, 103 S.Ct. at 2644. In order for the fruits of this investigatory detention to be admissible, however, the seizure itself must be conducted in a reasonable manner. *See id.* at 707–10, 103 S.Ct. at 2644–46. A seizure is reasonable if: (1) the length of the detention is sufficiently short, and (2) government agents act with diligence in pursuit of their investigation. *See id.* at 709, 103 S.Ct. at 2645. Although the Court in *Place* declined to adopt a "rigid time limitation," *id.* at 709 n. 10, 103 S.Ct. at 2646 n. 10 (rejecting ALI recommendation of 20–minute maximum for *Terry* stops), the Court did hold that "the [90–minute] length of the detention of [Place's] luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709, 103 S.Ct. at 2645.

■ Thus, in determining whether a luggage detention violates the Fourth Amendment, our inquiry has both an absolute and a context-specific component. The absolute component prohibits the government from detaining luggage for too long a period of time, regardless of the police officers' assiduousness in seeking probable cause. This component recognizes that when government action places too great a burden on people's liberty, the Fourth Amendment will bar that action, even if the government agents acted in an otherwise understandable and proper fashion. The context-specific component, by contrast, focuses not on the absolute length of the detention (and thus the absolute intrusion on liberty) but on whether law enforcement officers unduly ex-

ling administrative objective—searching for guns and explosives. Where an airport search goes beyond this narrow function in order to serve the broader objectives of law enforcement, it can no longer fall within the narrowly-crafted "administrative search" exception to the Fourth Amendment's warrant requirement. Although in *$124,570* we found particularly troubling the fact that FTS officers had a continuing relationship with law enforcement authorities, *see id.* at 1245, nothing in that case limits its holding to cases where such a continuing relationship exists. The rationale of *$124,570* applies in any case where airport security searches are employed to serve general law enforcement objectives.

Certain elements in the record cause us concern that the FTS officers exceeded their narrow commission here. It appears that the FTS offi-

cers only discovered the currency because they continued their investigation after they determined that Morgan was not carrying weapons or explosives. The district court rightly noted certain ambiguities in the record relating to this issue. *See $191,910,* 772 F.Supp. at 476. However, the fact that ambiguities exist does not aid the government's argument, because it is the *government's* burden to show that a warrantless search does not violate the Fourth Amendment. *See United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1295 (9th Cir.1988). Because we affirm the district court's decision on other grounds, we need not reach these questions. Were we required to reach them, however, we seriously doubt that we would permit the introduction of evidence obtained as a result of the airport search.

tended the detention by their lack of diligence. This component recognizes that even a relatively short detention can be unreasonable if it could have been much shorter had the police acted diligently.

The seizure of luggage from a traveller's possession "intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." *Place*, 462 U.S. at 708, 103 S.Ct. at 2645. Every minute that the detention continues exacerbates the intrusion on the luggage owner's liberty. *See United States v. LaFrance*, 879 F.2d 1, 9 (1st Cir.1989) ("Time *qua* time is of concern in the luggage seizure cases because of the concomitant impingence on liberty."). Even if government agents were perfectly diligent, then, a seizure without probable cause could still last too long to pass muster under the Fourth Amendment. For example, if an unforeseeable canine virus suddenly afflicted all of the drug-sniffing dogs in Hawaii, leaving them out of commission for a 24–hour period, government agents in Hawaii would not be justified in detaining a traveller's bags for the entire period on a mere reasonable suspicion. Regardless of the government's good faith and exercise of due care, the Fourth Amendment would not allow such an extensive impingement of the traveller's liberty without probable cause.[16] On the other hand, some detentions are clearly short enough that, so long as the government acts with diligence, no Fourth Amendment violation exists. In *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), for example, the Court upheld a 20–minute detention

on reasonable suspicion where police officers acted diligently to obtain probable cause.

The difficulty arises in attempting to draw the line separating those detentions which violate the Constitution solely because of their length from those which only violate the Constitution when accompanied by lack of law enforcement diligence. In *Place*, the Supreme Court refused to define the outer boundary of permissible seizures, *see* 462 U.S. at 709, 103 S.Ct. at 2645. However, the Court made clear that this boundary fell somewhere short of 90 minutes. *See id.* at 709, 103 S.Ct. at 2645 ("The length of the detention of respondent's luggage *alone* precludes the conclusion that the seizure was reasonable in the absence of probable cause.") (emphasis added).[17]

 Although we agree with the district court's conclusion that the detention of Morgan's baggage violated the Fourth Amendment solely because of its length, we need not rest our conclusion on this ground alone. For the district court was also correct in holding that the law enforcement agents failed to act with diligence in pursuing evidence of probable cause. Although government agents need not pursue the line of investigation that a reviewing court finds, in hindsight, to have been the most expeditious possible, they must not unreasonably fail to recognize or pursue avenues which would lessen the length of the detention. *See United States v. Holzman*, 871 F.2d 1496, 1501 (9th Cir.1989).

---

**16.** Similarly, if a police officer had sufficient reasonable suspicion to detain a *person*, he could not hold that person for 24 hours before obtaining probable cause, even if the government was working as quickly as it could to gather evidence establishing probable cause. *See* Wayne R. LaFave, *Search and Seizure* § 9.2(f) at 387 (2d ed. 1987).

**17.** Although the Court in *Place* stated that it "decline[d] to adopt any outside time limitation" of an investigatory detention, 462 U.S. at 709, 103 S.Ct. at 2645, and that it "question[ed] the wisdom of a rigid time limitation," *id.* at 709 n. 10, 103 S.Ct. at 2646 n. 10, in context the Court seemed to be saying that detentions of less than ninety minutes would not be immune from challenge, *not* that detentions of ninety minutes or

more could sometimes be upheld. Thus, the Court's dubiousness as to the wisdom of a rigid time limitation came in a footnote rejecting the American Law Institute's proposal of a 20–minute outer limit on *Terry* stops. Similarly, the Court's decision in *Sharpe, supra,* does not affect *Place*'s holding that the length of a detention standing alone can suffice to make the detention unconstitutional. In *Sharpe,* the Court rejected the Fourth Circuit's effective adoption of a *"per se* rule that a 20–minute detention is too long to be justified." 470 U.S. at 686, 105 S.Ct. at 1575. Although the Court emphasized the diligence of the police officers in upholding the 20–minute seizure at issue there, the Court did not hold that diligence could justify a detention as long as that in *Place.*

Here, the government agents failed to pursue avenues which would reasonably have appeared available to reduce the duration of the seizure. Before Morgan left San Diego, the government knew that it suspected him of drug trafficking and had reasonable suspicion to stop him. Agent Buckwalter knew by at least 11:30 A.M., more than an hour before Morgan's flight arrived and more than an hour and a half before his luggage was seized, that Morgan was coming to Oakland. *That* was the time to summon the dog, not after the agents seized the bags. Rather than seizing the luggage at the Oakland Airport and then driving it back to Belmont for the sniff (with an intervening stop in San Francisco), the agents should have arranged in advance for the dog to meet them at the airport. The failure to do so indicates "a distinct lack of diligence." 772 F.Supp. at 480.[18]

■ Where drug enforcement agents know that a suspect will be arriving at an airport on a particular flight in a particular time period, they do not act with diligence if they fail to have a drug-sniffing dog at the airport or at the very least to make arrangements for its arrival at the earliest possible time. *See United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1248 n. 9 (9th Cir. 1989) (stating that detention of luggage raised a "particularly troubl[ing]" claim under *Place* where, *inter alia,* DEA agents "had made no arrangements to obtain a dog prior to seizing Campbell's briefcase," where DEA agent knew Campbell was coming and met Campbell's plane). Making arrangements, of course, means making arrangements that are implemented. Asking an officer to come who ignores the request is not sufficient. Several circuits have found a lack of diligence on facts very similar to those in the present case. *See Moya v. United States,* 761 F.2d 322, 326–27 (7th Cir.1984) (invalidating three-hour detention of bag prior to dog sniff where officers were stationed at the airport specifically to investigate drug trafficking; "Under these circumstances, we

believe it is reasonable to expect officers to arrange to have a narcotics detecting dog readily available."); *United States v. Puglisi,* 723 F.2d 779, 789–91 (11th Cir.1984) (invalidating 140–minute detention of bag because agents could have arranged to have a dog within a reasonable distance of the airport or could have allowed the bag to go on to the traveller's next destination and have a dog waiting there); *United States v. Sanders,* 719 F.2d 882, 886–87 (6th Cir.1983) (holding three-hour detention of bag excessive where the police knew the suspect's plane was coming but did not bring the dog to the airport and instead made the defendant and her bag come to the DEA office for a dog sniff).

■ The government argues that there is no legal requirement that the police keep a drug dog stationed at the airport gate. As a general proposition, we agree with this statement—government agents who have no particular reason to believe that any particular drug suspect will be arriving on an incoming flight need not have a dog sitting continuously at the gate, the luggage area, or the nearby location where the search will be conducted. Where, though, government agents are at the airport awaiting a particular individual who they know is coming on a particular flight and whom they suspect of drug trafficking, they should arrange for a dog to be sent to the appropriate location as soon as they decide to meet the plane themselves. In *United States v. West,* 731 F.2d 90, 92 (1st Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985), the First Circuit recognized this point. The government relies on the *West* court's rejection of "an absolute requirement that DEA agents have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible." Yet the *West* court stated, just four sentences later, that "[c]learly the government must have its dog either at the same airport or at a similarly accessible location, so that the dog can sniff the suspect's luggage with dis-

---

18. The record is ambiguous regarding whether Agent Ginn actually contacted agent O'Malley, the dog's trainer, before leaving for Oakland. *See supra* note 4. But this makes no difference. Either Agent Ginn was at fault for failing to call Agent O'Malley, or Agent O'Malley was at fault for continuing to train with his dog in the park instead of coming to the airport. Either way, the agents' actions evidence a lack of diligence.

patch." *Id.*[19] The government also cites *United States v. Sterling,* 909 F.2d 1078, 1085 (7th Cir.1990), but that case involved only a general surveillance of flights from drug-source cities, where agents were not awaiting any particular suspect but rather were waiting to see if any disembarking passenger aroused suspicion. In such a situation, it is much more reasonable for the government to summon the dog only after acquiring reasonable suspicion. *See also United States v. Alpert,* 816 F.2d 958, 963 (4th Cir.1987) (upholding 50–minute luggage detention where the police were conducting a general surveillance of incoming flights, the dog was 10–15 minutes away, and the officers would have conducted the dog sniff within 15 minutes if the defendant had not decided to proceed without his bag).[20]

We conclude that the district court correctly held the detention of Morgan's bags to constitute an unreasonable search both because of the length of the detention and because of the government's lack of diligence in failing to act reasonably to obtain the

presence of a police dog at the airport once the agents knew Morgan was coming. Because the dog-sniff and the subsequent search of the bags were the fruit of this unlawful detention, we affirm the district court's order suppressing the dog's reaction to Morgan's bags and the evidence seized during the search.[21]

## IV.

■ Because the district court concluded that the government agents illegally detained Morgan's bags in violation of the Fourth Amendment, the court suppressed the money Morgan was carrying in his bags as a fruit of the unlawful seizure. *See United States v. $191,910 in U.S. Currency,* 788 F.Supp. 1090, 1096 (N.D.Cal.1992).[22] The government argues disingenuously that, since the money is the nominal "defendant" in these proceedings, the court was forbidden to suppress it even if it was obtained as a result of an unlawful seizure. Circuit precedent, as well

---

**19.** The agents in *West* also acted with a good deal more diligence and dispatch than did the agents here. They had a dog present at the airport when the suspect arrived, and they could have reached the dog within 20 minutes had the suspect so desired. In any event, the detention in *West* took only 45–60 minutes, substantially less than the detention here.

**20.** The government insists that *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), supports its position. There, the Court upheld a detention by customs officials of a suspected alimentary canal smuggler until she either defecated or submitted to an X-ray. This detention lasted some 16 hours. *Montoya de Hernandez* does not justify the two-hour seizure in this case, however. The events in *Montoya* took place at the border, where individuals effectively have no Fourth Amendment rights. *See United States v. Sandoval Vargas,* 854 F.2d 1132, 1133–34 (9th Cir. 1988). In addition, the exceptional nature of alimentary smuggling may necessitate a longer detention in order for reasonable suspicion to ripen into probable cause than does luggage smuggling, which only requires a few minutes for a dog to sniff the bag. We express no view on that point. In any event, we do not believe that *Montoya* renders the two-hour luggage detention in this case constitutional.

**21.** We are also troubled by Morgan's contention that evidence of a drug-sniffing dog's alert to

cash ought not to be given weight in a court's probable cause determination. Morgan argues that, because of the general contamination of America's paper money supply, the fact that a dog alerts to a particular batch of cash does not indicate that the money has been involved in drug trafficking or drug use. In recent years, courts have increasingly questioned the reliability of dog alerts for precisely this reason. *See United States v. $53,082.00 in United States Currency,* 985 F.2d 245, 250–51 n. 5 (6th Cir.1993); *United States v. $639,558.00 in United States Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992); *Jones v. U.S. Drug Enforcement Admin.,* 819 F.Supp. 698, 719–21 (M.D.Tenn.1993); *U.S. v. $80,760.00 in U.S. Currency,* 781 F.Supp. 462, 475–76 & n. 32 (N.D.Tex.1991), *aff'd,* 978 F.2d 709 (5th Cir.1992) (table). Morgan failed to raise this issue below or prepare a record on it. Accordingly, we do not resolve the question today. However, we note that we share the concerns expressed in the cases cited above.

**22.** The court did consider evidence that Morgan was carrying $15,000, because Morgan told the agents before the unlawful detention that he was carrying that amount. *See* 788 F.Supp. at 1092–93. However, because the agents did not discover that he was carrying $191,910 until after the search which was the fruit of the unlawful detention, the court suppressed the cash itself. *See* 788 F.Supp. at 1096. We note that even the evidence of the $15,000 would be inadmissible if the San Diego Airport search was unconstitutional. *See supra* note 15.

as logic and common-sense, forecloses this argument, however. For purposes of the Fourth Amendment, most courts treat the owner or possessor of the property as the defendant rather than the property itself.

Although forfeiture proceedings like the present case are nominally "civil" in nature, our legal system has recognized the opportunity we would create for oppressive government behavior if we were to treat these punitive proceedings, instituted in pursuit of law enforcement goals, as civil for all purposes. Accordingly, we have recognized that forfeiture proceedings are, in fact if not form, at least "quasi-criminal" in nature, and that claimants in forfeiture proceedings are entitled to certain of the procedural rights afforded to criminal defendants. *United States v. Riverbend Farms, Inc.*, 847 F.2d 553, 558 (9th Cir.1988). In particular, the Supreme Court has held that the Fourth Amendment exclusionary rule applies in these cases. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696, 85 S.Ct. 1246, 1248, 14 L.Ed.2d 170 (1965); *see also Boyd v. United States*, 116 U.S. 616, 638, 6 S.Ct. 524, 536, 29 L.Ed. 746 (1886) ("[A]lthough the owner of goods, sought to be forfeited by a proceeding *in rem*, is not the nominal party, he is, nevertheless, the substantial party to the suit; he certainly is so, after making claim and defence; and, in a case like the present, he is entitled to all the privileges which appertain to a person who is prosecuted for a forfeiture of his property by reason of committing a criminal offense.").[23]

In *United States v. $277,000.00 U.S. Currency*, 941 F.2d 898 (9th Cir.1991), we applied this rule to require the suppression of the $277,000 the government sought to forfeit, because the money was the fruit of an illegal search. Although we acknowledged that "the mere fact that property was illegally seized does not immunize that property

from forfeiture," *id.* at 902 (citing *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 450 (9th Cir.1983), *cert. denied sub nom. Webb v. United States*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984)), we held that illegally seized property could not be introduced as *evidence* in a forfeiture proceeding: "[A]ny evidence which is the product of an illegal search or seizure must be excluded in the forfeiture hearing. The Government must satisfy forfeiture requirements with untainted evidence." *Id.* at 902. We are bound to follow circuit precedent. Accordingly, we must hold that the district court was correct in excluding the illegally-seized money.[24]

Ignoring the force of *$277,000.00*, the government urges us to reason from two assertedly analogous Supreme Court decisions to conclude that an illegally seized res is *always* admissible for its evidentiary value in a forfeiture proceeding. Neither of these cases supports the government's argument, however. First, the government invokes *I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). There, the Court stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.... A similar rule applies in forfeiture proceedings directed against contraband or forfeitable property." *Id.* at 1039–40, 104 S.Ct. at 3483–84 (citations omitted). An examination of the facts of *Lopez–Mendoza* indicates that the Court was not stating that an illegally-seized res is admissible for its evidentiary value in a forfeiture proceeding. Instead, it was merely restating the settled point that the government can maintain an action against a defendant even if that defendant's presence was unlawfully procured. In the quoted passage, the

---

23. See also *Austin v. United States*, —— U.S. ——, ——, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993) (holding that civil forfeiture is subject to the Excessive Fines Clause of the Eighth Amendment).

24. The government argues that the res is never "evidence" in a forfeiture proceeding and thus that our holding in *$277,000.00* only bars the introduction of illegally-seized materials that are not the res. However, this argument ignores the

facts of *$277,000.00*. In that case, the claimant's sole argument was that the $277,000 res should have been suppressed because it was obtained through a constitutional violation. In holding that the district court should have suppressed the money, we treated the res just like any other evidence. We cannot now avoid that fact simply because we used the word "evidence" and not "res" in the sentences crystallizing our holding.

Court was responding to Lopez–Mendoza's argument that, because he was summoned to the deportation hearing following an unlawful arrest, he could not be deported. The Court specifically noted that Lopez–Mendoza "entered no objection to the evidence offered against him." *Id.* at 1040, 104 S.Ct. at 3484. The authorities cited by the *Lopez–Mendoza* Court also make clear that the case does not bar suppression of illegally seized property in a forfeiture hearing.[25]

■ On careful examination, *Lopez–Mendoza* merely reaffirms the longstanding rule that a court does not lose jurisdiction over an individual merely because the government secured his presence in the forum through illegal means. The "similar rule" which "applies in forfeiture proceedings" is the rule we recognized in *One 1977 Mercedes–Benz, supra,* 708 F.2d at 450: "the mere fact that

property was illegally seized does not immunize that property from forfeiture."[26] Nonetheless, the government cites cases from the Eighth and Second Circuits which have read *Lopez–Mendoza* as barring the evidentiary suppression of an illegally-seized res. *See United States v. $12,390.00,* 956 F.2d 801, 806–07 (8th Cir.1992) (dictum); *United States v. $37,780.00 in U.S. Currency,* 920 F.2d 159, 163 (2d Cir.1990). Neither case provides any analysis for its conclusion other than a naked citation to *Lopez–Mendoza.* Because we believe it clear that *Lopez–Mendoza* does not support the rule the government advocates, and because we have previously resolved the issue in a manner contrary to that urged by the government, we are compelled to disagree with the dictum and the holding of these two circuits respectively.[27]

25. The Court cited three cases which stated that a person could be convicted even if his presence in court resulted from an unlawful arrest: *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975) ("Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction.") (citing *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952)); *Frisbie,* 342 U.S. at 522, 72 S.Ct. at 511 ("This Court has never departed from the rule announced in [*Ker*] that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' "); *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 158, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923) (refusing to discharge a person held for deportation who was arrested on a warrant issued without probable cause, where later proceedings were regular and offered sufficient grounds for his detention). The *Lopez–Mendoza* Court also cited three forfeiture cases. These cases stand only for the equivalent proposition in the forfeiture context, that an illegally-seized res is *forfeitable.* They do not say that an illegally-seized res is *admissible* as evidence. *See United States v. $88,500.00,* 671 F.2d 293 (8th Cir.1982) (allowing forfeiture of an illegally seized res where probable cause was established by evidence untainted by the seizure); *United States v. One (1) 1971 Harley–Davidson Motorcycle,* 508 F.2d 351, 351 (9th Cir.1974) (allowing forfeiture of an illegally seized res where "all of the evidence introduced in the forfeiture proceeding was derived independently of the motorcycle's seizure"). Indeed, *United States v. One 1965 Buick,* 397 F.2d 782, 784 (6th Cir.1968), specifically stated that "the arrest was lawful and the search was pursuant to the authority of warrants which we have held to

be valid. No illegally obtained evidence was admitted in the forfeiture proceeding."

26. *United States v. An Article of Device "Theramatic",* 715 F.2d 1339 (9th Cir.1983), *cert. denied sub nom. Cloward v. United States,* 465 U.S. 1025, 104 S.Ct. 1281, 79 L.Ed.2d 685 (1984), cited by the government, stands for the same proposition. The *Theramatic* court merely stated that "an illegal seizure does not immunize the goods from *forfeiture,*" *id.* at 1341 (emphasis added), not that an illegal seizure cannot render the goods *inadmissible.*

27. We note that the majority of circuits to consider the issue have agreed with the rule we adopted in *$277,000.00* which requires the suppression of an illegally-obtained res. *See United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 872 (10th Cir.1992) ("[A]ny defects in process used to secure the possession of defendant property may defeat the government's right to possession, inasmuch as the government will be barred from introducing evidence illegally seized in violation of the fourth amendment to prove a claim of forfeiture.") (citations omitted); *United States v. $639,558.00 in U.S. Currency,* 955 F.2d 712, 715 n. 5 (D.C.Cir.1992) ("When illegally seized property is itself the 'defendant' in the forfeiture proceeding, it may not be 'relied upon to sustain a forfeiture,' ... but it is not 'excluded' from the proceeding entirely. Such property may be offered into evidence for the limited purpose of establishing its existence, and the court's *in rem* jurisdiction over it.") (quoting *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 698, 85 S.Ct. 1246, 1249, 14 L.Ed.2d 170 (1965)); *United States v. $91,960.00,* 897 F.2d 1457, 1462 n. 5 (8th Cir.1990) ("Had the money in this case been seized in violation of the fourth

The government also argues that we should reason from *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), to find the money admissible here. In that case, five justices joined opinions which stated that an in-court identification of the face of a criminal defendant may not be suppressed. *See id.* at 477, 100 S.Ct. at 1253 (Powell, J., concurring) (joined by Blackmun, J.); *id.* at 477–79, 100 S.Ct. at 1253–54 (White, J., concurring) (joined by Burger, C.J., and Rehnquist, J.). The government argues that, if a witness in a criminal case can point to the face of the defendant and say, "That is the person who attacked me!", then the government in a forfeiture case can introduce whatever evidentiary inferences appear on the "face" of the res (which is the nominal defendant). We find this argument unpersuasive.

Were we to hold that an illegally-seized res may not be suppressed, we would merely be "reward[ing] the government for carrying out an illegal search or seizure." David B. Smith, *Prosecution and Defense of Forfeiture Cases* ¶ 10.05[9] at 10–72.13 (1993). The government's analogy stretches too far the legal fictions which underlie these proceedings, and ignores the obvious differences between people and things. A res is simply not a person. A criminal trial ordinarily cannot proceed without the defendant, a person, in the courtroom. Because the defendant has the constitutional right to confront his accusers, it may seem only fair to allow witnesses to testify that the person sitting in court is the person whom they observed in a prior, untainted encounter. But there is no equally good reason for requiring the defendant res to be in the courtroom and therefore no comparable argument for allowing such testimony in this context. The res is not entitled to confrontation (if it was, the government would not be allowed to use hearsay to shift the burden of proof), and there are many other respects in which the res is not treated like a criminal defendant. The analogy to

the "face" of the defendant is also fraught with difficulties. What is the "face" of a thing? Were we to take the legal fiction that the res is a defendant as seriously as the government urges, we would be choosing, in the "face" of all logic, to treat a thing like a person with no reason other than to allow the government to circumvent the exclusionary rule. This we refuse to do.

Because we find the government's argument meritless, and because the law of this circuit is set forth in *$277,000.00*'s holding that an illegally-seized res may not be introduced into evidence in the face of a proper suppression motion, we are bound to follow that case. Accordingly, we affirm the district court's suppression of the money contained in the three bags that were searched, namely the $191,910.00 sought to be forfeited.

## V.

 After the district court granted his motion to suppress, Morgan moved for summary judgment on the ground that the government had failed to show probable cause for the institution of the forfeiture proceeding. In deciding the motion for summary judgment, the district court refused to consider a declaration prepared by Agent Buckwalter. This declaration, which was based on information the government acquired after it instituted these proceedings, stated that Morgan was involved in a large-scale marijuana distribution network and that Morgan's method of transporting the money on March 14, 1990, was consistent with the standard operating practices of that network. The district court held that 19 U.S.C. § 1615 requires the government to show that probable cause existed at the time it instituted forfeiture proceedings. Because Agent Buckwalter obtained his information nearly a year and a half after the government instituted the suit, the court excluded the declaration. 788 F.Supp. at 1096–97. The court also concluded that, even if Agent

amendment, it would have been excluded as evidence at trial but remained subject to forfeiture if the Government could establish probable cause through untainted evidence."); *see also United States v. $144,600.00, U.S. Currency*, 757 F.Supp. 1342, 1345 (M.D.Fla.1991) ("[T]he fact that proper-

ty was seized in violation of the fourth amendment will not immunize it from forfeiture. The forfeiture action can proceed if the government can show probable cause with untainted evidence; however, the item seized is not admissible into evidence.").

Buckwalter had gathered his information before the government instituted proceedings, his declaration would be insufficient to establish probable cause. *Id.* at 1097. The government challenges these rulings on appeal. We hold that 19 U.S.C. § 1615 requires the government to have probable cause at the time it institutes forfeiture proceedings.[28] The district court was therefore correct in refusing to consider the Buckwalter declaration.[29]

Congress established the procedures for forfeiture actions in 19 U.S.C. § 1615.[30] This statute provides that the claimant shall bear the burden of proof in all forfeiture actions, *"Provided,* That probable cause shall first be shown for the institution of such suit or action...." *Id.* The government contends that this language says nothing about *when* it must obtain the evidence establishing probable cause. In the government's view, the statute merely requires the government to establish probable cause at trial before the burden shifts to the claimant. The district court, however, held that the statute required the government to show that it had "probable cause at the time it brought the forfeiture proceeding." 788 F.Supp. at 1096. Thus, the district court refused to consider any evidence developed after institution of the proceeding in determining whether the government had satisfied § 1615. We agree with the district court.

The plain language of the statute makes clear that the government must have proba-

ble cause at the time it institutes the forfeiture proceedings. There is nothing ambiguous about the provision at all. The statute is not cast in abstract or general terms. It requires probable cause "for *the* institution" of "*such* suit or action." Moreover, the statute does not say that the government must have probable cause for the maintenance of the action, or probable cause for the continuation of the action, or even probable cause for the re-institution of the action. Even more critical, the statute does not simply say that the government must have "probable cause for its action." It says the government must have probable cause for the *institution* of *such* action. The clear import of this language is that the government must show that it had probable cause to institute—that is, probable cause at the time it instituted—the suit or action in which it seeks to forfeit the claimant's property.

The government argues that section 1615 only requires it to show probable cause as of the time of trial. Under the government's tortured construction of the statute, so long as its showing at trial would be sufficient to allow it to institute proceedings on that date, it has satisfied its burden.[31] This argument would make the words "institution of such" in the statute meaningless, however. If, in fact, the government can only show probable cause as of the time of trial—months after the institution of the forfeiture action that is being adjudicated—it has not shown probable cause for *the institution* of *such* suit or ac-

---

**28.** The district court's interpretation of § 1615 is a question of law which we review de novo. *See Anderson v. United States,* 966 F.2d 487, 489 (9th Cir.1992).

**29.** Because we agree with the district court that after-acquired evidence is inadmissible to prove probable cause, we need not reach the issue regarding the sufficiency of the Buckwalter declaration.

**30.** Section 1615 applies in this action pursuant to 21 U.S.C. § 881(d).

**31.** The case the appellant cites for this proposition, *United States v. One 56–Foot Motor Yacht Named the Tahuna,* 702 F.2d 1276, 1281 (9th Cir.1983) does not support the government's interpretation. In that case, the court did not address the meaning of "for the institution of such suit or action" at all. The court simply stated that, under section 1615, the burden of

proof shifts to the claimant after the government makes a "preliminary showing" of probable cause. *Id.* at 1281 (quoting *United States v. One Twin Engine Beech Airplane,* 533 F.2d 1106, 1107 (9th Cir.1976) (per curiam)). The court clearly did not mean "preliminary showing" in the sense of a watered-down showing that probable cause might exist. The court only meant that the showing of probable cause precedes (is preliminary to) the shifting of the burden of proof. This rather obvious statement of the statute's allocation of burdens has nothing whatsoever to do with the question of whether the government must have probable cause at the time it institutes the proceedings. Indeed, it is entirely consistent with the commonsense interpretation we afford section 1615: the burden of proof does not shift to the claimant until the government makes a preliminary showing that probable cause existed at the time the proceedings were instituted.

tion. Instead, it has only shown that it has probable cause for *its* action and probable cause for the *institution* of *another* action. We cannot imagine that Congress would have worded the statute the way it did if it only intended to require a showing of probable cause as of the time of trial.

■ The plain meaning of a statute is ordinarily dispositive unless that meaning is contrary to the legislature's intent or would lead to absurd results. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 432 & n. 12, 107 S.Ct. 1207, 1213 & n. 12, 94 L.Ed.2d 434 (1987). The government does not allege that the plain meaning of § 1615 contradicts the intent of the legislature. However, although it does not cast the inquiry in these terms, the government does argue that the plain meaning of § 1615 could lead to three potential absurd results. We find these arguments wholly unpersuasive.

First, the government argues that enforcement of section 1615 according to its plain meaning "would discourage prompt filings of forfeiture." We find no merit in this claim. Requiring the government to show that it had probable cause at the time it brought the action would only discourage filings of forfeiture when probable cause does not exist. Such a result is entirely proper. Without such a rule, government agents might be tempted to bring proceedings (and thereby seize property) on the basis of mere suspicion or even enmity and then engage in a fishing expedition to discover whether probable cause exists. The Second Circuit has recently warned of this possibility. *See United States v. $31,990,* 982 F.2d 851, 856 (2d Cir.1993) (quoting George C. Pratt & William B. Petersen, *Civil Forfeiture in the Second Circuit,* 65 St. John's L.Rev. 653, 668–69 (1991)). The institution of a forfeiture action can have serious effects on an owner's right to use and control his property. It should not be undertaken without a demonstrably good reason. The plain language of the statute recognizes this fact and requires the government to obtain evidence

supporting probable cause *before* bringing such an action.

Second, the government argues that requiring it to have probable cause before commencing proceedings would place too heavy a burden on law enforcement. The government contends that such a rule "'would require the government to segregate its evidence by date of acquisition and prove when such evidence is obtained.'" This argument borders on the frivolous. By holding that § 1615 requires the government to show that it had probable cause at the time it instituted forfeiture proceedings, we only require the government to do the same thing it must do in hundreds of suppression hearings every day: show that, before taking some action (be it a search, a seizure, or an institution of forfeiture proceedings) the government had probable cause. It is true that the government must keep records of when it obtained its evidence in order to satisfy this standard, but such a burden is neither unique nor particularly cumbersome. Any adequately-administered law enforcement office already keeps records in far more detail than would be necessary to make such a showing. In any event, the burden imposed on the government by § 1615 is far less onerous than the burdens the government must bear in prosecuting someone following a grant of use immunity, *see Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) or in showing that evidence is not the "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In both of these situations, the government must show that a prior tainted acquisition of information did not affect its subsequent gathering of evidence. In such cases, the government may well be forced to segregate its evidence by time and source and submit to careful scrutiny of its sources to ensure that they were not affected by the prior taint.[32] Here, by contrast, the government need only show that it had evidence establishing probable cause on a certain date. This is a far easier burden.

32. See, for example, the detailed and elaborate inquiry the D.C. Circuit required in the Oliver North case. *United States v. North,* 910 F.2d 843, 853–73 (D.C.Cir.) (per curiam), *adhered to,* 920 F.2d 940, 941–47 (D.C.Cir.1990) (per curiam) (en banc).

Finally, the government argues that our interpretation of section 1615 would "encourage legal gamesmanship and unnecessarily technical efforts to amend pleadings to add newly-acquired evidence." This argument simply misses the point. Under section 1615, the government must *have* probable cause at the time it institutes forfeiture proceedings, not merely *plead* probable cause. Whether probable cause exists to institute proceedings is solely a question of what information is in the government's possession; even if the government were to amend its pleadings to include new evidence, the amendment could not change the historical fact that the government did not have probable cause at the time it brought the case.[33] While a subsequent amendment might cure a violation of the pleading-with-particularity requirement in Supplemental Rule E(2)(a),[34] it would stretch the concept of "relation back" too far to say that an amendment of pleadings can turn back time and make probable cause exist on a date when it did not. Civil forfeiture proceedings are already rooted in one legal fiction; there is no justification for adding another, more tenuous legal fiction to the mix.

Indeed, consideration of the special pleading requirements applicable in forfeiture cases makes clear that the plain meaning of § 1615 is far from absurd. The Supplemental Rules for Certain Admiralty and Maritime Claims[35] require that complaints for forfeiture be verified and that they state with particularity the facts underlying the claim. Fed.R.Civ.P. C(2), E(2)(a). These rules abandon the concept of notice pleading and instead require allegations of specific facts supporting probable cause. *See United States v. Certain Real Estate Property Located at 4880 S.E. Dixie Highway*, 838 F.2d 1558, 1563–64 (11th Cir.1988); *United States*

*v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1219 (10th Cir.1986). When the government official signs the verified complaint, he must "satisfy himself that the averments in the complaint are true, based either upon his own knowledge or upon information and belief." 7A *Moore's Federal Practice* ¶ B.09, at B–402 (1988). Because the government must swear that probable cause exists at the time it institutes the action, and that specific facts exist to support probable cause, it is entirely reasonable to conclude that probable cause must actually exist when the government brings forfeiture proceedings.

■ Because the government has not shown any contrary legislative intent or any absurd results flowing from the enforcement of § 1615 according to its plain meaning, the plain meaning of the statute ends our inquiry. Nevertheless, there is additional support for our conclusion. Even if we found the terms of § 1615 to be ambiguous, we would still have to agree with the district court's interpretation of § 1615, because forfeiture statutes are strictly construed against the government. *See United States v. One 1936 Model Ford V–8 DeLuxe Coach*, 307 U.S. 219, 226, 59 S.Ct. 861, 864, 83 L.Ed. 1249 (1939). There are good reasons for this rule. Government confiscation of private property is disfavored in our constitutional system. We are therefore reluctant to find that a statute allows forfeiture where a plausible interpretation of the statute would not allow it.

We are particularly wary of civil forfeiture statutes, for they impose "quasi-criminal" penalties without affording property owners all of the procedural protections afforded criminal defendants. *See Riverbend Farms*, 847 F.2d at 558. The relative ease of obtaining forfeitures may tempt the government to seek criminal law enforcement objectives

---

**33.** By the same token, even if the government *pled* probable cause with particularity at the time it instituted the proceedings, this fact alone would not protect the government against dismissal where the government did not actually *have* probable cause.

**34.** It is not clear, incidentally, that such an amendment would cure a violation of Supplemental Rule E(2)(a). Given that the Supplemental Rules abandon notice pleading in forfeiture

cases, *see infra* p. 1069, there may well be good reason to apply the amendment provisions in the Federal Rules of Civil Procedure less liberally than in ordinary civil actions. We do not decide this issue here, however.

**35.** The Supplemental Rules For Certain Admiralty and Maritime Cases (Federal Rules of Civil Procedure A–F) apply in this case pursuant to 21 U.S.C. § 881(b).

through these nominally "civil" proceedings.[36] Indeed, the "war on drugs" led to more than a 1500 per cent increase in federal asset forfeitures between 1985 and 1990. *See* U.S. Dep't of Justice, *Federal Forfeiture of the Instruments and Proceeds of Crime: The Program in a Nutshell* 1 (1990). "For the first time since the Civil War, forfeiture has been used vindictively, as punishment against those involved in illegal activity." George C. Pratt & William B. Petersen, *Civil Forfeiture in the Second Circuit*, 65 St. John's L.Rev. 653, 670 (1991).[37] Forfeiture is a " 'harsh and oppressive procedure' which is not favored by the courts." *$31,990*, 982 F.2d at 856 (quoting *United States v. One 1976 Mercedes Benz 280S*, 618 F.2d 453, 454 (7th Cir.1980)). Accordingly, "the burden on the government to adhere to procedural rules should be heavier than on claimants." *United States v. $38,000.00 in United States Currency*, 816 F.2d 1538, 1547 (11th Cir.1987).

Even if some civil forfeiture schemes might, as a matter of statute, provide procedural protections for property owners, section 1615 provides few if any. The government need only show probable cause, and it can make this showing without introducing evidence that meets the ordinary criteria for trustworthiness and admissibility. *See United States v. One 56–Foot Motor Yacht Named the Tahuna*, 702 F.2d 1276, 1283 (9th Cir.1983). Having satisfied this minimal obligation, the government will take title unless the owner can demonstrate by a preponder-ance of the evidence that his property is not tainted. "Because the claimant carries a comparatively high burden, the government may divest claimant of title with a mere probable cause showing, often established through the use of inadmissible evidence." *$12,390.00*, 956 F.2d at 810 (Beam, J., dissenting in part). Such a procedure involves a serious risk that an innocent person will be deprived of his property. Although this Circuit has upheld § 1615 against a due process challenge, *see United States v. One 1970 Pontiac GTO*, 529 F.2d 65 (9th Cir.1976) (per curiam), judges have increasingly expressed concern with "the ease with which title to property may be forfeited under the statute." *$12,390.00*, 956 F.2d at 807 (Beam, J., dissenting in part). At least one judge has argued that the statute's near total lack of procedural safeguards contravenes the Fifth Amendment's Due Process Clause. *See id.* at 807–12. Even with the requirement that the government have probable cause at the time it institutes the forfeiture hearing, the statute provides very little protection for property owners' rights. We refuse to read out one of the few safeguards it contains.

In view of the plain meaning of the forfeiture statute and the rule of strict construction applicable to such statutes, we must respectfully disagree with the Second and Sixth Circuits, which have held that the government need not have probable cause at the

---

**36.** See Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives*, 42 Hast.L.J. 1325, 1329 (1991) ("Police and prosecutors have embraced civil strategies not only because they expand the arsenal of weapons available to reach antisocial behavior, but also because officials believe that civil remedies offer speedy solutions that are unencumbered by the rigorous constitutional protections associated with criminal trials, such as proof beyond a reasonable doubt, trial by jury, and appointment of counsel.").

**37.** As the Supreme Court recently noted, forfeitures have also been used as a source of revenue for the government. The government's "direct pecuniary interest in the outcome of the proceeding" makes us especially wary of official overreaching in this context. *United States v. James Daniel Good Real Property*, — U.S. —, —, 114 S.Ct. 492, 502, 126 L.Ed.2d 490 (1993). The Court observed:

The extent of the Government's financial stake in drug forfeiture is apparent from a 1990 memo, in which the Attorney General urged United States Attorneys to increase the volume of forfeitures in order to meet the Department of Justice's annual budget target:
"We must significantly increase production to reach our budget target.
"... Failure to achieve the $470 million projection would expose the Department's forfeiture program to criticism and undermine confidence in our budget projections. Every effort must be made to increase forfeiture income during the remaining three months of [fiscal year] 1990."
*Id.* at — n. 2, 114 S.Ct. at 502 n. 2 (quoting Executive Office for United States Attorneys, U.S. Dept. of Justice, 38 United States Attorney's Bulletin 180 (1990)) (ellipsis and alteration in Supreme Court opinion).

time it institutes forfeiture proceedings.[38] Instead, we agree with the Eighth Circuit that the court should only consider "evidence obtained up until the point at which the government institutes forfeiture proceedings." *United States v. $91,960.00*, 897 F.2d 1457, 1462 (8th Cir.1990). We also agree with the First Circuit's recent decision in *United States v. Parcels of Property*, 9 F.3d 1000 (1st Cir.1993), which held that the district court must consider whether the government had probable cause on the date it instituted the forfeiture action.

The position of the Second and the Sixth Circuits finds its origin in *United States v. Premises and Real Property at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1268 (2d Cir.1989).[39] There, the court held that evidence acquired ten months after the institution of forfeiture proceedings was relevant and admissible to show probable cause. The court relied on the Second Circuit's previous decision in *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1162 (2d Cir.1986), which had held that the government "need not *demonstrate* probable cause until the forfeiture trial." *Id.* (emphasis added).[40] Since the government need not actually prove probable cause until trial, the court argued, "there is no persuasive reason to bar" the use of evidence of probable cause obtained after the filing of the complaint. *Livonia*, 889 F.2d at 1268.

In making its decision, the *Livonia* court ignored several well-considered district court opinions from its own circuit—including the district court opinion affirmed in *Banco Cafetero. See United States v. $134,752.00 U.S. Currency*, 706 F.Supp. 1075, 1082 (S.D.N.Y. 1989); *United States v. Banco Cafetero International*, 608 F.Supp. 1394, 1405 (S.D.N.Y.1985), *aff'd sub nom. United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.1986).[41] The court did not even attempt to reconcile its conclusion with the plain language of section 1615, which clearly requires probable cause for the *institution* of the forfeiture proceeding. Nor did the court take note of the rule requiring strict construction of forfeiture statutes. Finally, the court performed quite a leap in reasoning from *Banco Cafetero* to its result in *Livonia*. Even if the government does not have to *prove* probable cause until trial, (and we do not mean to suggest that we agree with that proposition) this does not mean that the government need not even *have* probable cause at the time it initiates proceedings. The filing of the forfeiture complaint allows the government immediately to obtain a warrant for the arrest of the res, without any further showing of probable cause. Indeed, arrest of the res is a jurisdictional *requirement. See Republic Nat'l Bank v. United States*, —— U.S. ——, ——, 113 S.Ct. 554, 557, 121

---

**38.** The government also cites the Eleventh Circuit's ambiguous, unexplained dictum contained in a footnote in *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1439 & n. 24 (11th Cir.1991) (en banc). We are not certain what the *Four Parcels* court intended that footnote to say. However, even if the note was intended as supporting the Second and Sixth Circuits' view, it would add nothing to the discussion.

**39.** The Sixth Circuit case cited by the government, *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 284 (6th Cir.1992), simply adopts *Livonia's* conclusion without any additional analysis. Moreover, *$67,220.00* has been persuasively criticized by a district court in its own circuit. *See Jones v. U.S. Drug Enforcement Admin.*, 819 F.Supp. 698, 715–16 (M.D.Tenn. 1993). The other Second Circuit case the government cites, *United States v. $37,780 in United States Currency*, 920 F.2d 159, 163 (2d Cir.1990), also follows *Livonia*, although the court in that case faced a different issue from the one we face here. In *$37,780*, the question was whether a

*seizure* of the res without probable cause required dismissal of the forfeiture action. Although the government did not have probable cause when it seized the property, it did have probable cause when it later instituted forfeiture proceedings.

**40.** *Banco Cafetero* rejected the claimant's argument that he was entitled to a prompt post-seizure hearing to determine probable cause. The court held that the claimant would have to wait until trial (or summary judgment, if appropriate) for adjudication of the issue of probable cause.

**41.** In *$134,752.00*, the district court stated that "[p]robable cause must be shown to have existed at the time the forfeiture proceeding was instituted." 706 F.Supp. at 1082. Similarly, in *Banco Cafetero*, the district court said that, "[u]ltimately, the government must show that it had probable cause at the time of commencement of the actions." 608 F.Supp. at 1405.

L.Ed.2d 474 (1992).[42] The least we can require of the government before initiating these events is that probable cause exist.

In sum, we hold that 19 U.S.C. § 1615 means exactly what it says: the government must have probable cause at the time it institutes forfeiture proceedings. In seeking to establish that it had probable cause to bring these proceedings, the government may not rely on evidence acquired after the forfeiture complaint was filed. The district court was correct in refusing to consider the Buckwalter declaration.

## VI.

■■■■■■■ Having determined that the district court correctly decided the suppression issues, we have little difficulty in holding that the district court was also correct in concluding that the government failed to establish probable cause.[43] At most, the evidence that the government legally obtained prior to the institution of forfeiture proceedings raises only a suspicion that the money was furnished or intended to be furnished in exchange for drugs.

■■■■■■ The standard of probable cause to support a forfeiture is similar to that required for a search warrant. *See Tahuna, supra*, 702 F.2d at 1281. As the requirement is traditionally stated, the government's belief that the property is subject to forfeiture must be more than a mere suspicion but can be less than prima facie proof. *See United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir.1984) (per curiam). We have held that the determination of whether probable cause exists to support a forfeiture must be based on the totality of the circumstances. No single factor is dispositive. *See United States v. U.S. Currency, $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988).

■■■■ Probable cause to believe that the property is involved in *some* illegal activity is not enough—the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes. The government brought this proceeding under a statute which renders money subject to forfeiture if it is (1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws. *See* 21 U.S.C. § 881(a)(6). Thus, the government must show that, at the time it brought this action, it had probable cause to believe that the money in Morgan's bags was used or intended to be used in a drug transaction. *See United States v. $5,644,540.00 in U.S. Currency*, 799 F.2d 1357, 1362–63 (9th Cir.1986).

Here, the government cannot show more than a mere suspicion that the money seized from Morgan's bags was connected with drug activities. Because the district court properly suppressed the money Morgan was carrying and the drug-sniffing dog's reaction to the bags, the government can only rely on three pieces of evidence to show that it had probable cause at the time it instituted these proceedings: (1) the admission by Morgan that he was carrying $15,000 or $20,000 in cash; (2) the discrepancies in the stories Morgan told the various agents in San Diego and Oakland; and (3) the results of the San

---

**42.** Because judicial seizure of the res is a jurisdictional prerequisite to a forfeiture action which accompanies the institution of the action, allowing the government to institute forfeiture proceedings without probable cause would foster circumvention of 21 U.S.C. § 881(b)(4), which allows the Attorney General to seize property without judicial process only if the government has probable cause at the time of seizure. *See United States v. All Funds Presently on Deposit, etc.*, 813 F.Supp. 180, 186 (E.D.N.Y.1993).

**43.** We review a district court's probable cause determination de novo. *See United States v. Dickerson*, 873 F.2d 1181, 1184 (9th Cir.1988).

We also review a district court's grant of summary judgment de novo. *See Jones v. Union Pacific R. Co.*, 968 F.2d 937, 940 (9th Cir.1992). In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party to determine whether any genuine issues of material fact exist and whether the district court correctly applied the substantive law. *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992). In a forfeiture case, we construe the procedures in Rule 56 in light of the procedural requirements of the statutory law of forfeitures. *See Tahuna*, 702 F.2d at 1281.

Diego X–Ray.[44] While these facts may raise a suspicion of illegal activity involving cash transactions, none, individually or collectively, is sufficiently probative of criminal wrongdoing and even less so of drug activity.

Fifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity. Indeed, any amount of money, standing alone, would probably be insufficient to establish probable cause for forfeiture. *See United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 285 (6th Cir.1992) (stating that "no court has yet held that the presence of a large sum of cash is sufficient, standing alone, to establish probable cause for forfeiture"). Moreover, although we have considered the presence of a large amount of money, when accompanied by additional factors pointing to drug activity, to be evidence that the money was drug-related, we have never reached this conclusion when the sum of money involved was as small as the $15–20,000.00 involved here. *See, e.g., United States v. $215,300 U.S. Currency,* 882 F.2d 417, 419 (9th Cir.1989) (per curiam) (more than ten times the cash here); *United States v. $83,310.78,* 851 F.2d 1231, 1236 (9th Cir. 1988) (at least four times the cash here); *United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.1984) (per curiam) (four to six times the cash here). Nor have we ever concluded that probable cause existed under 21 U.S.C. § 881(a)(6) absent evidence tending to establish that the money was drug-related. *See, e.g., $215,300, supra* (positive canine alert, cash was being carried on a flight to a known drug-source city, travel agency that issued ticket was known to work for drug dealers); *$83,310.78, supra* (person who possessed the money had three prior drug convictions); *$93,685.61, supra* (presence of drug paraphernalia). Because there was no corroborating evidence in this case which clearly indicated that the money was drug-related, we conclude that the $20,000.00 Morgan admitted to carrying could not establish probable cause or even amount to strong evidence of a connection to illegal drugs.

Furthermore, the discrepancies in Morgan's story were not all that great: he told the FTS officer that he was not carrying any money, but he then told the drug task force agents in San Diego and Oakland that he was carrying a large amount of cash; on some occasions, he said that he was carrying $20,000, while on other occasions he said he was carrying $15,000; he told the agents that the money belonged to his client, but then he said that some belonged to him as well; he told the agents he could not remember when he had taken the money out of his savings. These kinds of inconsistencies may raise a suspicion that Morgan was involved in illegal activities, but not probable cause.

Most important, there is nothing in either the amount of money Morgan admitted to carrying or the partially conflicting explanations he offered which connects the money to drugs. *See United States v. $38,600.00 in U.S. Currency,* 784 F.2d 694, 699 (5th Cir. 1986) (holding that $38,600 which was concealed under the back seat of a car and which was found along with a pipe containing marijuana residue and cigarette rolling papers may give rise to probable cause to believe that the money was connected with *some* illegal activity, but created no more than a mere suspicion that the money was furnished or intended to be furnished in exchange for drugs). Morgan could just as easily have been a distributor of "street money" in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S & L crook as a drug conspirator. However, as we have explained, suspicions of general criminality are not enough. To obtain forfeiture under § 881, the government must have *probable cause* to believe that the money is connected specifically to *drug* activities.

Viewing the evidence in the light most favorable to the government, we conclude that it was not sufficient to establish probable cause to believe the money had a substantial connection with illegal activities of any kind, let alone illegal drug activities. Therefore, the district court was correct in granting summary judgment to Morgan.

---

**44.** As we noted above, even these three pieces of evidence are inadmissible if the San Diego Airport search violated the Fourth Amendment. *See supra* note 15.

The judgment of the district court is AFFIRMED.