**UNITED STATES of America, Plaintiff,**

v.

**$16,500 IN UNITED STATES CURRENCY, in rem, Defendant;**

**Piedad Barajas–Avalos and Jose Maciel–Basan, Claimants.**

**No. Civ. 97–946–FR.**

United States District Court, D. Oregon.

May 8, 1999.

---

Kristine Olson, United States Attorney, Kenneth C. Bauman, Assistant United States Attorney, Portland, OR, for plaintiff.

Kristen L. Winemiller, Tennyson & Winemiller, Portland, OR, for claimants.

## OPINION

FRYE, District Judge.

The matters before the court are 1) the plaintiff's request that the court issue a certificate of reasonable cause under 28 U.S.C. § 2465; and 2) the claimant's motion for costs (# 54–1) and attorney fees (# 54–2).

## FACTS

On January 2, 1997, task force agents at the Portland International Airport seized $16,500 from claimant Jose Maciel–Basan. Maciel–Basan had purchased a one-way ticket from Portland, Oregon to the Orange County, California International Airport in the name of Macila. Maciel–Basan was observed by agents to be assisted by another individual, Jorge Jimenez, who appeared to be acting as Maciel–Basan's interpreter. The agents observed that both Maciel–Basan and Jimenez seemed to be nervous and were shuffling

their feet, occasionally wiping their foreheads, and constantly looking around the airport terminal.

The agents first contacted Maciel–Basan. They requested and received permission from him to search his bag and to pat down his coat. The agents located money inside his coat pocket and hidden in the small of his back.

The agents advised Maciel–Basan that he was not under arrest; however, in response to their inquiry about the money, Maciel–Basan told them that it belonged to a person named "Piedad Barajas." Maciel–Basan showed the agents a business card that he carried. The business card was for a business, Panzer Nursery, Inc., 17980 West Baseline Road, Beaverton, Oregon 97006, telephone: 503–645–1185. Maciel–Basan stated that he was taking the money, all $16,500, to Los Angeles, California for Piedad Barajas, who was his boss at Panzer Nursery, Inc., because Barajas had asked him to do so. Maciel–Basan stated that the money was to be used to open a cantina in Los Angeles. Maciel–Basan stated that he did not know where the cantina was to be located. Maciel–Basan stated that he was to be met at the Orange County airport by someone named "Guadalupe," and that Guadalupe would take him from there. Maciel–Basan stated that he had entered the United States illegally in February of 1996, and that he had been employed in the landscaping business in the Portland area.

Agents advised Maciel–Basan that a dog trained in narcotics detection was going to sniff the currency, and that if the dog "alerted" on the currency it would be seized. The dog had a positive "alert" at the site of the hidden currency. The money was seized. Maciel–Basan was released, and no charges were filed against him.

On January 2, 1997, a government agent attempted to call Piedad Barajas at telephone number 654–1185. On January 3, 1997, government agents again attempted to contact Barajas.

On January 3, 1997, counsel for Barajas contacted the government agent who had seized the currency to inform the agent that the currency belonged to her client, Barajas; that she represented Barajas; and that she wished to discuss the matter with the agent.

On January 8, 1997, counsel for Barajas contacted Agent Patrick O'Connor of the Drug Enforcement Administration (DEA). Counsel described the nature of the intended transaction in Los Angeles, California and the source of the funds seized. Counsel told Agent O'Connor that substantiating documentation was being gathered.

On April 8, 1997, counsel for Barajas provided the government with a Notice of Claim, including a detailed letter, the affidavit of Barajas, and other supporting affidavits. Barajas stated in his affidavit that the money was for the purchase of the Copa Cabana cantina in Los Angeles, California; and that the money came from a number of sources, including $5,000 from a friend, Custodio Hernandez; $5,000 from a friend, Lorenzo Camposano; $5,000 from building a fence with his brother, Enrique Barajas–Avalos, for owners of a home in Forest Grove, Oregon; and money saved. A copy of the check from the homeowners was attached to the affidavit of Barajas. Barajas further stated in his affidavit that he had had no involvement in any drug-related activity, and that the money was not to be used in any drug-related transaction. Additional affidavits were submitted by Jose Maciel–Basan, Lorenzo Camposano, Custodio Hernandez, and Enrique Barajas–Avalos, the sworn testimony of each in support of the facts as stated by claimant Barajas in his affidavit.

On June 20, 1997, the plaintiff, the United States of America, filed a complaint *in rem* for forfeiture of the $16,500. The affidavit of Agent O'Connor was submitted in support of the complaint. The United States asked the court to find that there was probable cause to believe that this money was the proceeds traceable to an

exchange for controlled substances or that this money was used or intended to be used to facilitate such a drug transaction. In his affidavit, Agent O'Connor sets out his extensive background in law enforcement; the facts surrounding the seizure of the $16,500 on January 2, 1997; the two attempts to contact Piedad Barajas by telephone on January 2 and January 3, 1997; and his knowledge of the additional investigation of Jose Maciel–Basan and Piedad Barajas. Agent O'Connor states in his affidavit the following facts:

Oregon DMV lists an identification card number 9012161 in the name of Jose Maciel–Basan with an address of, 645 SE 11th Avenue, Hillsboro, Oregon issued March 28, 1996.... In Maciel's papers and [sic] additional address of 662 NW Cornell, Hillsboro, Oregon was listed. This is the address for Piedad Barajas.... A criminal check of Piedad Barajas shows that Barajas has Oregon Driver's License Number's 6498440 which refers to Number 2384864. Barajas is currently suspended from driving. According to LEDS, Barajas has a has [sic] two arrests for misdemeanor assault however no drug arrests or convictions was [sic] located.

21. Based upon information from TFA Raby and other law enforcement officers involved in the seizure of $16,500 from Jose Maciel on January 2, 1997, I believe that the cash is the proceeds from the sale of drug controlled substances or was intended for the purchase of drug controlled substances, and was enroute from Portland, Oregon to Los Angeles, California a source area for drug controlled substances. My belief is, based on my training and experience that couriers for criminal organizations utilize fictitious names when transporting drug controlled substances or the proceeds generated from and used for, the acquisition and distribution of drug controlled substances. Maciel had in his possession a[sic] Oregon Identification Card in the name of Maciel, Jose, however his ticket was in the name of Maciela, Jose. Maciel had a false Social Security Card in the name of Jose Nacial Basar.

22. Maciel's explanation that he was transporting the cash for Piedad Barajas is somewhat sound, however, in my opinion based on my experience if a large quantity of cash was to be used for a business transaction some type of bank instrument would be the appropriate method to transport the funds, not cash. A bank instrument could have been sent by mail and would not have required that a $159.00 airplane ticket be purchased to transport the funds. A check with United States Treasury indices indicates that no Currency Transaction Reporting (CTR) form was filed by Barajas for the amount seized from Maciel. Such a form would have been generated if Barajas had removed the cash from a bank account. I know that the illegal drug business is a cash and carry business, and any legitimate method of transferring cash can leave a "paper trail" for law enforcement officers to detect and can be evidence and that persons involved in the illegal drug business try to avoid such a paper trail. Additionally Maciel's [sic] purchased a ticket with cash one way to a source city area. He stated that he was told that he was to meet a person known to him only as Guadalupe. This is a story commonly utilized by couriers. However in this instance, Maciel had the name Lupe Calderon written down on a piece of paper contained in his wallet. It would appear to me that Maciel knew whom he was meeting and had been untruthful.

23. Further, based on my training and experience, I know that persons involved in the illegal drug business utilize cash as the primary method of payment for drug controlled substances. I know that persons involved in the illegal drug business routinely use commercial transportation because it is the fastest and most efficient method of getting the drug controlled substances or money

from one location to another. The method in which Maciel was transporting the case, i.e. secreted in the small of his back, under his clothing is a common method employed by couriers, so the cash will not be detected at airport security checkpoints, will not be located in luggage if it is searched and will not be lost if the luggage is lost or stolen. And finally there was the positive alert by "Nora" to the $16,500 in cash.

Affidavit of Patrick R. O'Connor, pp. 11–13 (attached as Exhibit A to Complaint *in rem*).

In his affidavit, Agent O'Connor does not refer either to the involvement of counsel for Piedad Barajas, which began several days after the seizure of the money, or to the affidavits of Piedad Barajas, Jose Maciel–Basan, Lorenzo Camposano, Custodio Hernandez, and Enrique Barajas–Avalos, which set forth facts regarding the source and the use of the seized currency which were provided to the government in support of the claim made by Barajas in April of 1997.

Based upon the complaint *in rem* and the facts set out in the affidavit of Agent O'Connor, the court issued a warrant for arrest of the property finding that there was probable cause to believe that the defendant, $16,500 in United States currency, represented proceeds traceable to an exchange for drug controlled substances or was used or intended to be used to facilitate such a transaction.

In August of 1997, the claimants, Piedad Barajas–Avalos and Jose Maciel–Basan, filed an answer and a claim stating that the currency was owned by Piedad Barajas–Avalos, and that the currency was being transported for lawful purposes as set forth in the affidavits of Piedad Barajas–Avalos, Jose Maciel–Basan, Lorenzo Camposano, Custodio Hernandez, Enrique Barajas and Jorge Jiminez which had been forwarded to the government in April of 1997 along with the Notice of Claim.

On October 14, 15 and 16, 1998, a trial was held in this court. The claimants, Piedad Barajas–Avalos and Jose Maciel–Basan, presented testimony to the jury from Jose Maciel–Basan, Enrique Barajas, Fred Panzer, Lorenzo Camposano, and Piedad Barajas–Avalos in order to carry their burden to refute the finding of probable cause. These witnesses testified consistent with their affidavits provided to the government in April of 1997. The government presented testimony from government agents involved in the seizure of the money at the airport and the subsequent investigation, including Richard Raby, Andrew Furnia, Ronald Spotty, Jerry Clark and Agent Patrick O'Connor in support of its claim of probable cause to believe that the $16,500 was forfeitable to the government.

The court instructed the jury, in part, as follows:

At a prior time, the court found that there was probable cause to believe that the $16,500 in U.S. currency at issue in this case was forfeitable to the government under federal law.

Probable cause exists when under the totality of the circumstances, and the reasonably drawn inferences therefrom, a reasonable person would have concluded that there is a fair probability that the defendant $16,500 in U.S. currency was forfeitable under federal law.

At the time the court made the finding of probable cause, the court was only aware of evidence presented by the government and did not have any evidence concerning the claimants' position before it. You should not consider the earlier finding of probable cause to be any suggestion as to what verdict you should return. That is a matter entirely up to you.

Jury Instruction No. 10.

The jury found that the claimants, Piedad Barajas–Avalos and Jose Maciel–Basan, had carried their burden to refute probable cause to believe that the $16,500 was used or intended to be used for illegal

drugs or was the proceeds from an illegal drug exchange. The jury returned a verdict in favor of the claimants.

On January 20, 1999, the court entered a judgment ordering the government to return the $16,500 to the claimants. Thereafter, the government moved the court to enter judgment finding that:

> pursuant to Title 28, United States Code, Section 2465, ... there was reasonable cause for the seizure and retention of the defendant $16,500.00 in U.S. currency and that no federal, state, county or city official or agency involved in the seizure and retention of the defendant $16,500 in U.S. currency, is liable to suit or judgment on account of said seizure and retention of the defendant $16,500 in U.S. currency.

Proposed Certificate of Reasonable Cause Pursuant to 28 U.S.C. § 2465, pp. 1–2.

On February 8, 1999, the claimants filed a motion for costs and attorney fees under Fed.R.Civ.P. 54(d) and 28 U.S.C. § 2412 in the amount of $20,000.

## CONTENTIONS OF THE CLAIMANTS

The claimants contend that they should be allowed to recover their attorney fees and costs in this matter for three reasons: 1) the government's seizure and retention of the currency was not substantially justified, as was evidenced during the government's presentation at trial; 2) claimant Barajas–Avalos offered detailed information and credible evidence to support his claim to the money beginning the day following its seizure; and 3) law enforcement seizures of relatively small amounts of cash, such as the $16,500 at issue in this action, will go uncontested even by innocent claimants if pursuing a claim will, necessarily, mean incurring an obligation for legal fees and costs far in excess of the value of the disputed property.

The claimants state that they do not intend to bring suit against the plaintiff or any of its officers. The claimants state that their objection to the Certificate of Reasonable Cause is motivated solely by their desire to recover a portion of their legal costs and attorney fees. *See* Reply to Plaintiff's Response to Claimants' Motion for Costs and Attorney Fees, p. 2.

Claimant Barajas–Avalos contends that he directed his lawyer to be as forthcoming as possible with the government from the beginning and at every opportunity; that he provided the government with full and complete factual information about the currency and the claimants, including supporting affidavits, prior to the institution of the forfeiture action; and that the affidavit of Agent Patrick O'Connor submitted to the court in support of the finding of probable cause omitted any reference to the involvement of counsel for claimants in the case or to the information, including the affidavits that had been provided to the government by counsel for the claimants. The claimants contend that there was no evidence at trial that either claimant had any known ties to drugs or had ever been found to use or possess drugs. The claimants contend that the evidence relied upon by the jury in reaching its verdict was known to the government well in advance of trial, shortly after the seizure and prior to the institution of this action.

## CONTENTIONS OF THE GOVERNMENT

The government concedes that a finding of reasonable cause under 28 U.S.C. § 2465 does not automatically translate into a denial of an award of costs to a claimant under the Equal Access to Justice Act. The government contends, however, that there was probable cause to seize the $16,500 based upon the facts set forth in the affidavit of Agent O'Connor. The government further contends that the claimants are not entitled to attorney fees and costs under the EAJA because the claimants and the court did not challenge the finding of probable cause in this case prior to or at the time of trial.

## ANALYSIS

### 1. *Certificate of Reasonable Cause*

Section 2465 of Title 28, United States Code, entitled "Return of property to claimant; certificate of reasonable cause; liability for wrongful seizure" provides:

> Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.

28 U.S.C. § 2465 (West 1994). This statute immunizes government officials from liability and bars successful claimants from recovering their costs incurred as a result of the seizure of their property in cases where these officials had "reasonable cause" to seize the property.

■ "Reasonable cause" within the meaning of section 2465 is essentially synonymous with probable cause. *Stacey v. Emery*, 97 U.S. 642, 646, 24 L.Ed. 1035 (1878). To satisfy its burden of establishing that there is probable cause to forfeit a property, the government must prove that it had reasonable grounds to believe that the property was forfeitable "supported by less than prima facie proof but more than mere suspicion." *United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1195 (9th Cir.1999) (quoting *United States v. Real Property 874 Gartel Drive*, 79 F.3d 918, 922 (9th Cir.1996)); *see also United States v. One 56–Foot Motor Yacht Named the Tahuna*, 702 F.2d 1276, 1282 (9th Cir. 1983). Probable cause to believe that the property is involved in *some* illegal activity is not enough—the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes. *United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1186 (9th Cir.1995) (quoting *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1071 (9th Cir.1994)).

■ The claimants state that their objection to the Certificate of Reasonable Cause is motivated solely by their desire to recover a portion of their legal costs and attorney fees under the EAJA. Since the issuance of a Certificate of Reasonable Cause does not bar the claimants from recovering attorney fees under the EAJA, the court will not create a disputed issue where one does not otherwise exist between the parties to this litigation. The court will issue a Certificate of Reasonable Cause.

### 2. *Attorney Fees, Costs and Expenses Under the EAJA*

Once the court determines that a Certificate of Reasonable Cause shall issue, the government official is immunized from the claimants seeking to recover costs incurred in defending the action. However, courts have concluded, and the government in this case concedes, that the Certificate of Reasonable Cause under section 2465 does not bar claimants from seeking attorney fees under the EAJA. *See, e.g., United States v. 255 Broadway*, 795 F.Supp. 1225, 1234 (D.Mass.1992); *United States v. One Parcel of Real Estate*, 864 F.Supp. 1267, 1269 (S.D.Fla.1994); Plaintiff's Response to Claimants' Motion for Costs, p. 2.

Section 2412 of Title 28, United States Code, entitled "Costs and fees" provides, in relevant part:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was

substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (West 1994 & Supp.1996).

[E]ligibility for a fee award in any civil action requires: (1) that the claimant be a prevailing party; (2) that the Government's position was not substantially justified; (3) that no special circumstances make an award unjust; and, (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement.

*Commissioner, INS v. Jean,* 496 U.S. 154, 158, 110 S.Ct. 2316, 110 L.Ed.2d 134 (internal quotations omitted).

"[T]he specific purpose of the EAJA is to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions." *Id.* at 163, 110 S.Ct. 2316. The specific statutory goals of the EAJA are to "encourag[e] private parties to vindicate their rights and [to] curb[ ] excessive regulation and the unreasonable exercise of Government authority." *Id.* at 164–65, 110 S.Ct. 2316 (internal quotations omitted).

 The burden of demonstrating substantial justification for its position rests squarely upon the government. *Kali v. Bowen,* 854 F.2d 329, 332 (9th Cir.1988). The decision whether the government's position was substantially justified is made based upon the facts of the litigation as a whole and includes both the prelitigation and the entire litigation position. *Id.*

 In the case before the court, the claimants prevailed. The claimants contacted the government through their attorney explaining the source of and the purpose for the money within days of the seizure on January 2, 1997. The claimants provided a Notice of Claim and affidavits supporting their position that the money was not proceeds of a drug offense or intended to be used for a drug offense in April of 1997, more than two months prior to the institution of this action. The claimants presented consistent evidence throughout the pretrial proceedings and the trial. After the January 2, 1997 seizure, which was based upon the legal but asserted suspicious behavior of Maciel–Basan at the airport and the alert of the drug dog, the government found no further evidence connecting claimant Barajas–Avalos or claimant Maciel–Basan with drugs.

The government contends that the court should find its position substantially justified upon the fact that the court found probable cause in June of 1997. The standard applied by the court at that time was "less than prima facie proof but more than mere suspicion." *Thurman St.,* 164 F.3d at 1195. In addition, the materials presented by the government in support of the complaint *in rem* for forfeiture upon which the court relied omitted any mention of the material provided to the government in April of 1997 by the claimants regarding the purpose for and the source of the $16,500. This information was relevant to the issue of probable cause.

The United States Supreme Court has recognized that a district court's determination of "whether the Government's litigating position has been 'substantially justified' is … a multifarious and novel question." *Pierce v. Underwood,* 487 U.S. 552, 562, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). "[B]ecause the number of possible situations is large, we are reluctant either to fix or sanction narrow guidelines for the district courts to follow." *Id.* (internal quotations omitted).

The government's evidence here was weak; the amount of money seized was not large in relation to the cost to the claimants to defend the case. Based upon the unique facts of this case, the court finds that the government has not carried its burden to prove that its position throughout the litigation was substantially justified.

## CONCLUSION

The court will issue a Certificate of Reasonable Cause. The claimants' motion for costs (# 54–1) and attorney fees (# 54–2) is granted. Pursuant to the request of the government, the court will allow the government ten days to address the issue of the amount of costs and fees the court should award. The claimants shall have ten days thereafter to file a response.